[No. S004702. Dec. 11, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES F. HORTON II, Defendant and Appellant.

## COUNSEL

Michael Rubin, under appointment by the Supreme Court, Marsha S. Berzon, Lowell Finley and Altshuler, Berzon, Nussbaum, Berzon & Rubin for Defendant and Appellant.

Jay B. Gaskill, Public Defender (Alameda), Michael S. Ogul and John T. Philipsborn as Amici Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar, Robert S. Henry, Joan Comparet, William T. Harter, Susan Lee Frierson and Lance E. Winters, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, J.**—Following the guilt phase of a jury trial, defendant James F. Horton II was convicted of one count of first degree murder (Pen. Code, §§ 187, 189)[1] and one count of robbery (§ 211), and the jury found true the special circumstance allegations that the murder occurred in the course of a robbery (§ 190.2, subd. (a)(17)) and that defendant had suffered a prior murder conviction (§ 190.2, subd. (a)(2)). Following the penalty phase of the trial, the jury returned a verdict of death.

We conclude the prior-murder-conviction special-circumstance finding must be vacated and the sentence of death set aside. The judgment is otherwise affirmed.

FACTS

I. *Guilt Phase Evidence*

 A. *The prosecution case.*

On October 11, 1982, Herschel "Lobo" Bowser was discovered in his apartment located at 10459 Artesia Boulevard in the City of Bellflower,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

lying on the floor in front of the doorway, his head covered with blood and pieces of brain matter. A claw hammer, later marked for identification as the People's exhibit No. 3, was lying in a pool of blood within a foot of his body. He had suffered a fractured skull and 12 separate blunt injuries to his head, consistent with force applied by a hammer, as well as lacerations and bruises to his left hand. He was alive but later died following surgery.

The police arrived as paramedics were transporting Bowser in an ambulance from his apartment. Several canvas bank bags containing approximately $10 in coins were on top of the desk. An empty leather wallet was found under a pillow in the bedroom. A safe on the floor in the bedroom closet was closed and locked. Also found in the apartment were items associated with narcotic sales, including plastic "baggies," mannitol (a cutting agent), and a sifter. An empty plastic container was on the kitchen counter near the stove. A latent print investigation was conducted at the crime scene, but the only identifiable print (lifted from a tool box) matched that of the victim.

Carolyn Ebel lived in the same apartment building as Bowser and was his girlfriend. She first met him in early 1982 when he hired her as a driver for a truck in his catering business. Eventually she became his girlfriend and began living in his apartment, although she also maintained a separate residence and continued to work as a driver in the catering business.

Ebel testified that Bowser was a drug dealer and sold cocaine from his apartment. She had seen Bowser on a daily basis prepare for sale, and sell, cocaine. He stored the cocaine in three "ziploc" plastic bags in a plastic butter container, which he kept in a kitchen cabinet near the stove. One of the bags was marked with three "X's." She had seen defendant on six or seven occasions at Bowser's apartment buying cocaine. Bowser kept a large amount of cash in his apartment and usually carried approximately $500 on his person.

On October 11, at 9:30 in the morning, Ebel entered Bowser's apartment to pick up her paycheck. She used her key to unlock the two locks on the door, one of which was a deadbolt. Bowser was in bed asleep. She did not wake him when she retrieved her paycheck from the table next to the bed. When she departed, she left behind her catering truck wallet, which contained approximately $100.

Tracy Crisp, a resident of another apartment in the building, telephoned Ebel later that day to tell her that she had been unable to reach Bowser on the telephone. Ebel returned to Bowser's apartment at approximately 2:30 in the afternoon. Placing her key in the top lock, she found it was unlocked. Opening the door she found that it was partially blocked by Bowser's body,

lying on the floor. The apartment had been ransacked. She called the paramedics and, while awaiting their arrival, walked around the apartment. She observed that her trucker's wallet and money bag were missing. In the kitchen, the plastic butter container was on the stove uncovered, and the plastic bags of cocaine that had been stored inside were gone. Ebel testified that, in an attempt to conceal the circumstance that Bowser had been dealing in drugs, she removed a scale, a plastic bag containing several hundred Quaalude pills, and Bowser's telephone directory listing the names of his drug customers.

In October 1982, Michael Graham resided at the Shangri-Lodge apartment complex in Compton, as did defendant. Graham and defendant were employed by the manager of the complex, Willie Dorn, and performed odd jobs. One morning defendant asked Graham for a hammer that belonged to Dorn. After obtaining the hammer for defendant, Graham never saw him again.

On the morning of October 10, 1982, defendant knocked on Dorn's bedroom window and told Dorn that "he had something he was going to do," and that "if it worked out okay," defendant would be moving out the next day. On October 11, defendant told Dorn he was leaving, and departed in his automobile, accompanied by James Cunnigan and another man (established by other evidence to be Anthony Wilson). A few days later, defendant telephoned Dorn and inquired whether anyone had been looking for him, and specifically whether the police had been looking for him. Defendant subsequently telephoned Dorn on approximately four occasions, making the same inquiry. Defendant requested that Dorn instruct Graham that in the event anyone asked whether Graham had given defendant anything, Graham should deny having done so.

At trial, Dorn identified People's exhibit No. 3 as the hammer he had owned for 12 years. He recalled that in October 1982, Graham had been using the hammer, and Dorn thereafter noticed it was missing. The police asked Dorn for a sample of the paint that was used on the Shangri-Lodge buildings. One of the five kinds of white paint on the hammer matched the paint sample provided by Dorn.

The prosecution's principal witness was Donald "Foo" McLaurin. McLaurin had known defendant since 1980. Both men used cocaine. On a number of occasions, defendant had taken McLaurin to an apartment building on Artesia Boulevard (identified as the building where the victim, "Lobo" Bowser, resided) to purchase cocaine. McLaurin never entered the building, but on each occasion when defendant returned, defendant was in possession of cocaine and told McLaurin he had purchased the drugs from a man named "Lo."

In October 1982, McLaurin also resided at the Shangri-Lodge apartments. He testified that on the morning of October 10 (the day before Bowser was killed), he (McLaurin) walked from his apartment to defendant's apartment, where he joined defendant, defendant's friend Anthony Wilson, and defendant's brother William Horton. In the afternoon, the four men drove in defendant's automobile to the apartment building on Artesia Boulevard. Defendant entered the building while the other three men waited outside. When defendant returned, he had a bag of cocaine with him. The men proceeded to Ray's Motel, where they smoked the cocaine. They were freebasing and consumed five or six grams, worth $500 to $600. McLaurin got "high" and proceeded with defendant to another motel, where the two men freebased additional quantities of cocaine. Eventually McLaurin, defendant, and Wilson returned to the Shangri-Lodge. James Cunnigan (known as "Doonie") joined the three of them at defendant's apartment, where they all consumed additional cocaine. In the late evening hours, when their supply of cocaine was depleted, defendant suggested "hustling," i.e., robbing, a drug dealer as a means of replenishing their supply. Defendant began to discuss a plan to rob his dealer on Artesia Boulevard. He said that he could not use a gun, because there would be too much noise, but that he could enter the apartment with a pipe, and as the dealer turned around to close the door, defendant would be able to "slug him a few times." Defendant said he knew his dealer kept cocaine in one of the kitchen cabinets. Defendant asked McLaurin whether he would drive him to the apartment building in McLaurin's girlfriend's automobile. McLaurin initially agreed but, when his girlfriend refused to lend the vehicle, departed with her.

On the following afternoon, October 11, a Monday, defendant called McLaurin at his workplace. He asked McLaurin to meet him at Ray's Motel and stated "he did the number he was talking about last night." When McLaurin arrived there, defendant, Wilson, and Cunnigan were inside a motel room.[2] McLaurin saw they had three bags of cocaine—two with powder and one with cocaine rocks. One of the bags was marked with black "X's." He also observed a large roll of money. As the men began to smoke the cocaine, Cunnigan stated that "everything went down pretty smooth." Defendant explained that he entered the apartment and, as the dealer turned his back to close the door, defendant clubbed him on the head with a hammer. Defendant then went to the kitchen cabinet and removed the cocaine. After leaving the crime scene, defendant's vehicle overheated on the freeway, and he and his companions abandoned it. At a later point, defendant requested that McLaurin pick up the vehicle. McLaurin and Cunnigan returned to the automobile and retrieved "a couple of bags of

[2]Cunnigan and Wilson were charged, along with defendant, with the robbery and murder of Bowser, but their cases were disposed of separately from defendant's.

weed" and a gym bag, proceeding to the Shangri-Lodge without the vehicle. Upon rejoining defendant, they consumed an additional quantity of drugs. Later, McLaurin drove defendant to the bus depot.

McLaurin's job supervisor testified that on October 11, 1982, McLaurin arrived for work at 5:45 a.m. and left at 1 p.m after receiving a telephone call.

In November 1984, after being incarcerated on a probation violation, McLaurin was placed in the same jail module with defendant. At one point McLaurin met with defendant's attorney in the attorneys room at county jail. McLaurin testified at trial that he (McLaurin) lied to defendant's attorney on this occasion. McLaurin informed defense counsel prior to trial that he had lied.

On cross-examination, McLaurin admitted having told defense counsel that he had been untruthful concerning everything he had told the police that was the subject of his testimony.

B. *The defense case.*

The defense presented evidence of police reports of several burglaries committed in 1982 in the same apartment complex where the victim resided, as well as in the general vicinity.

The parties stipulated to the reading of the preliminary hearing testimony of Carolyn Ebel. At one point during that testimony, Ebel stated that on October 11, she returned to the victim's apartment at 10:30 a.m. At another point she testified that she returned at 2:30 p.m.

Deputy Sheriff LaPorte testified that he did not search the crime scene for a possible murder weapon other than the hammer, because that object had been plainly visible. In his written report, he described the hammer as having a dark blue-grey rubber handle with blood and paint stains on it. He released the hammer to a criminalist at the crime scene.

In closing argument, the defense argued the prosecution had failed to prove beyond a reasonable doubt that defendant was the killer. At the conclusion of the guilt phase, the jury returned a verdict finding defendant guilty of first degree murder and robbery, and found true the special circumstance allegation that the murder was committed in the course of the robbery.

II. *Special-circumstance-phase Evidence*

James Padar testified that in April 1973, he was a homicide investigator with the Chicago Police Department, assigned to a case entitled People v.

James Horton, in which defendant was charged with murder. Padar testified that he attended the trial in that case and was present when the jury returned a verdict convicting defendant of murder. A certified copy of a document issued by the Illinois Department of Corrections, reflecting defendant's 1973 conviction of murder, was received in evidence.

At the conclusion of the special circumstance phase, the jury returned a verdict finding true the special circumstance allegation that defendant had suffered a prior conviction of murder.

### III. *Penalty Phase Evidence*

The prosecution did not present any evidence at the penalty phase, but in closing argument the prosecutor argued that the death penalty was justified by the aggravating factors consisting of the circumstances of the crime and defendant's prior murder conviction.

The defense presented, in mitigation, evidence of defendant's troubled family history, some of the circumstances of the 1973 Chicago murder, defendant's employment at a convalescent hospital, and the effects of long-term cocaine usage.

Caroline Hughes, defendant's grandmother, testified that defendant's mother suffered beatings at the hands of defendant's father and that defendant's parents divorced shortly after he was born. During his youth, defendant had little contact with his father. When he was a child, defendant was struck by a truck and was confined in a body cast for approximately eight months. When he was seven years of age, his mother developed leukemia and died within eight months. Hughes and her husband thereafter raised defendant.

Hughes testified that following the death of defendant's mother, his performance in elementary school seriously declined, and his misbehavior required that he be counselled by a psychologist. By the eighth grade, defendant was associating with juvenile delinquents and street gangs. She described the circumstances leading to the shooting and death of a boy in Chicago that resulted in defendant's 1973 conviction of murder. She testified that a codefendant, Michael Golden, who at the time was 21 years of age, was involved in the shooting. Golden had a "terrible" reputation and made "all the children, all the teenagers, do what he wanted them to do." Although Golden was acquitted of the murder charge, Hughes said it was he who was primarily responsible for the incident. Defendant was imprisoned when he was 17 or 18 years of age. He completed his schooling while in prison.

Errol Carter, Hughes's son, testified that he was the same age as defendant and that they were raised together. Carter recalled defendant's crying at his

mother's funeral and believed his personality changed after her death. According to Carter, defendant performed well in school when strictly supervised, but became hostile when Caucasian children referred to him as "nigger." In his opinion defendant performed "very functionally" in a structured environment.

Ron Siegel, M.D., a psychopharmacologist who was qualified as an expert on the effects of drugs on human behavior, testified regarding the effects of cocaine usage, particularly freebasing. These include hallucinations, psychosis, and violent behavior. Dr. Siegel testified regarding defendant's history of drug use as related by defendant. On the basis of that history, Dr. Siegel formed the opinion that defendant exhibited the symptoms of a chronic cocaine user.

A nurse at a convalescent hospital, where defendant had been employed as a nurse's assistant, testified that she had worked with him in 1982 or 1983. This witness testified that defendant was punctual and well liked by the patients and by his coworkers.

At the conclusion of the penalty phase, the jury returned a verdict imposing the punishment of death.

IV. *Guilt Phase Issues*

A. *Jury selection issues.*

1. *Claim of denial of representative jury venire.*

During the jury selection process, defendant moved to quash the petit jury venire, asserting the jury selection process in Los Angeles County violated his right to a jury drawn from a fair cross-section of the community. In support of his motion, he presented evidence that, he maintained, demonstrated a prima facie case that Hispanics and African-Americans were systematically underrepresented in the jury venire. The trial court denied the motion. Defendant renews his contention.

Under the federal and state Constitutions, an accused is entitled to a jury drawn from a representative cross-section of the community. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *Duren* v. *Missouri* (1979) 439 U.S. 357, 358-367 [58 L.Ed.2d 579, 583-588, 99 S.Ct. 664]; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community. (*People* v.

*Mattson* (1990) 50 Cal.3d 826, 842 [268 Cal.Rptr. 802, 789 P.2d 983].) "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren* v. *Missouri, supra,* 439 U.S. at p. 364 [58 L.Ed.2d at pp. 586-587]; *People* v. *Howard, supra,* 1 Cal.4th at p. 1159.) The relevant "community" for cross-section purposes is the judicial district in which the case is tried. (*People* v. *Mattson, supra,* 50 Cal.3d at p. 844; *Williams* v. *Superior Court* (1989) 49 Cal.3d 736, 744-745 [263 Cal.Rptr. 503, 781 P.2d 537].) If a defendant establishes a prima facie case of systematic underrepresentation, the burden shifts to the prosecution to provide either a more precise statistical showing that no constitutionally significant disparity exists or a compelling justification for the procedure that has resulted in the disparity in the jury venire. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 491 [273 Cal.Rptr. 537, 797 P.2d 561].)

As to the third element of the *Duren* test, a defendant does not meet the burden of demonstrating that the underrepresentation was due to systematic exclusion, by establishing only statistical evidence of a disparity. A defendant must show, in addition, that the disparity is the result of an improper feature of the jury selection process. (*People* v. *Howard, supra,* 1 Cal.4th at p. 1160; *People* v. *Bell* (1989) 49 Cal.3d 502, 530 [262 Cal.Rptr. 1, 778 P.2d 129].) When a county's jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, the defendant must identify some aspect of *the manner in which those criteria are applied* (the probable cause of the disparity) that is constitutionally impermissible. (*People* v. *Sanders, supra,* 51 Cal.3d at p. 492; *People* v. *Bell, supra,* 49 Cal.3d at p. 524.)

■ The Los Angeles County jury selection process to which defendant objects was examined in *People* v. *Mattson, supra,* 50 Cal.3d 826, where the defendant challenged the method of assigning jurors in 1985 to the Southeast Judicial District (Norwalk)—the same judicial district and the same year in which the present case was tried. In *Mattson,* we described the selection process as "one that was peculiar to Los Angeles County in which 11 judicial districts existed at the time of defendant's trial [which commenced in 1985]. Each of those districts summoned jurors from the surrounding area, but in compliance with former section 203 of the Code of Civil Procedure, no prospective juror was assigned to a courthouse more than 20 miles from his or her residence." (*Id.* at p. 843, fn. omitted.)

In the present case, the county's director of jury services testified to the method of selecting prospective jurors, explaining that the master jury list

for the year is compiled from the voter registration list as well as the Department of Motor Vehicles' list of persons holding driver's licenses or identifications cards. The lists are merged to create a file of names of potential eligible jurors, to whom questionnaires are sent to determine whether the person is qualified for jury service. Of the total number of questionnaires sent, approximately 56 percent are returned completed, 15 percent are undeliverable, and 29 percent are not returned. "Follow-up," i.e., further attempts to contact the potentially eligible jurors from whom completed questionnaires were not received, is not performed, because it does not yield satisfactory results in relation to cost. Thus, approximately 56 percent of the mailed questionnaires provide a basis for further selection.

Defense expert Dr. W. Butler presented statistical evidence of a disparity between the number of African-American and Hispanic persons who served on Norwalk jury venires and those presumptively eligible for jury service within a 20-mile radius of the Norwalk courthouse. Dr. Butler did not present any statistical or other evidence tending to establish the probable cause of this disparity, however, but opined that this underrepresentation of Hispanics and African-Americans on the jury panels was not the result of chance, but rather of some aspect of the jury selection system. He speculated that the 44 percent of the population to whom questionnaires are mailed and from whom there is no response might account for the underrepresentation, i.e., that the 44 percent comprised a primarily minority population. He explained additionally that the Central Judicial District's 20-mile limit overlapped that of the Southeast Judicial District (Norwalk), and that because the Central Judicial District had priority in the selection of eligible jurors, the Norwalk court drew from a more restricted area.

In denying the motion to quash, the court found that a disparity existed between the percentage of Hispanics and African-Americans in the Norwalk area and the respective percentage of those minorities who comprised the jury venires, but that such underrepresentation was not the result of systematic exclusion of either of these groups. The court noted the selection process employed to compile the master list from the county registrar of voters and the Department of Motor Vehicles was race neutral and nondiscriminatory, and Dr. Butler's speculation as to the cause of this underrepresentation was insufficient to establish constitutionally impermissible systematic exclusion of African-Americans or Hispanics.

Subsequent to the trial in the present case, this court held that the relevant community for the purpose of determining whether the cross-section requirement has been met is the judicial district in which a case is tried. *(Williams v. Superior Court, supra,* 49 Cal.3d at pp. 744-746.) At defendant's trial, he

challenged the jury venires as underrepresentative of the African-American and Hispanic populations within the 20-mile radius of the Norwalk courthouse, and did not present any evidence tending to establish that the percentage of these minorities on the jury venires at that courthouse was unfair in relation to the percentage of these minorities in the jury-eligible population of the Southeast Judicial District. For this reason, defendant failed to make a prima facie showing that the representation of African-Americans and Hispanics in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the "community," with the meaning of *Duren*. (See *Williams* v. *Superior Court, supra*, 49 Cal.3d at p. 746.)

Defendant maintains that, in light of *Williams*'s clarification of the definition of the relevant community for comparison purposes, he is entitled to have his case remanded for a new evidentiary hearing to afford him the opportunity to present evidence of a disparity under this new definition. Defendant cites no authority, however, that supports his claim to entitlement to remand, and such a remand for the purpose sought by defendant is particularly unwarranted in this case in light of our decision in *People* v. *Mattson, supra*, 50 Cal.3d 826. In that case, as we have noted above, the defendant raised a similar challenge to the jury selection system as applied in the Southeast Judicial District of Los Angeles County in the same year as the trial in the present case—1985. There the defendant's evidence demonstrated —as did the evidence in the present case—that although the area within a 20-mile radius of the Norwalk courthouse had a high population of African-Americans and Hispanics, the population of the smaller area from which the Norwalk court tended to draw jurors was more predominantly Caucasian. The county's director of jury services, however, testified that no disparity existed with respect to the percentage of Hispanics and African-Americans in the pertinent population and on Norwalk jury venires, from either a countywide perspective or at the judicial district level. We accordingly held in *Mattson* that the defendant had failed to satisfy the second *Duren* prong, and therefore had not established a prima facie violation of the cross-section guarantee. (50 Cal.3d at p. 844.)

Moreover, the remand proposed by defendant is unjustified in light of the trial court's finding, supported by the record, that there was an insufficient showing that any discrepancy in the jury pool was attributable to "systematic exclusion"—because the procedures employed by the jury commissioner were, on their face, race neutral, and the opinion of Dr. Butler as to the cause of any disparity was not supported by empirical evidence but, rather, amounted to no more than speculation. (See *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1278-1279 [18 Cal.Rptr.2d 796, 850 P.2d 1].) For these

reasons, we reject defendant's claim of denial of his right to a representative jury.

2. *Claim of Witherspoon error in the excusal of two prospective jurors for cause.*

■ Defendant contends the trial court improperly restricted defense counsel during *"Witherspoon"* voir dire (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 522 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770]) in questioning two prospective jurors after their responses indicated an unwillingness to impose the death penalty. We find no error.

During voir dire as to the qualifications of the prospective jurors to serve on a capital case, the trial court determined to ask each prospective juror a set of four standard questions based upon *Witherspoon*.[3] Defense counsel requested a ruling limiting voir dire, and, in response, the trial court ruled that if a juror's responses to the four questions were "appropriate," i.e., did not indicate a basis for excusal for cause, no further voir dire would be permitted, but that if a juror was unclear regarding a question, further inquiry would be permitted.

[3]The four standard questions posed by the trial court were as follows:

(a) "If the People prove beyond a reasonable doubt that the defendant is guilty of murder in the first degree, would you refuse to vote for such a verdict because of a conscientious opinion concerning the death penalty, knowing that to do so would obligate the jury to get into a second and possibly a third phase of the trial?

"In other words, regardless of the evidence and in every case, because of a conscientious opinion concerning the death penalty, would you automatically vote for something other than murder in the first degree knowing that such a vote would end the death penalty question once and for all?"

(b) "If the People prove beyond a reasonable doubt not only that the defendant is guilty of murder in the first degree, but also prove beyond a reasonable doubt that the alleged special circumstance is true, that is that the murder occurred during the commission of a robbery, would you refuse to vote for a verdict of truthfulness of the special circumstance because of a conscientious opinion regarding the death penalty and knowing that such a verdict would obligate the jury to get into the penalty phase?

"In other words, because of a conscientious objection to the death penalty, in every case and regardless of the evidence presented, would you automatically vote for a verdict of false as to the alleged special circumstance because you know such a verdict would end the death penalty question then and there?"

(c) "If we get to the penalty phase of the trial, would you automatically and absolutely refuse to vote for the death penalty in any case and regardless of the evidence presented during the penalty phase because of any conscientious opinion you may hold concerning the death penalty?

"In other words, regardless of the evidence and because of your conscientious opinion concerning the death penalty would you in every case automatically vote for life imprisonment without possibility of parole and never vote for a verdict of death?"

(d) "Finally, if we get to the penalty phase of the trial, would you automatically, in every case, and regardless of the evidence presented, vote for a verdict of death and never vote for a verdict of life imprisonment without possibility of parole?"

Thereafter, in the course of the voir dire of prospective juror Ahumada, after she stated that because of a conscientious objection she never would vote for death and automatically would vote for life without possibility of parole, regardless of the evidence, defense counsel sought to examine this witness further. The prosecutor asked to approach the bench, and a subsequent discussion ensued outside the presence of the prospective juror.

Defense counsel, seeking to justify further inquiry, explained that, by his motion to limit voir dire, he had sought to preclude further inquiry only if a juror answered "no" to a particular question, but had not intended to preclude further inquiry in the event a juror's response indicated that excusal for cause might be warranted (because of an unwillingness to impose the death penalty). The prosecutor interjected that, if further inquiry were permitted, the prosecution as well as the defense should be permitted to make inquiry.

Ultimately the trial court stated it was prepared to allow voir dire by both sides, or, alternatively, would "grant the defense motion" and preclude voir dire absent an ambiguous response by a juror, offering to defense counsel the choice of these two alternatives. Defense counsel responded, "I want to stand on my written motion," whereupon the trial court ruled that it would bar voir dire unless a juror's response was ambiguous.

Prospective juror Ahumada thereafter was challenged and excused for cause. Subsequently, prospective juror Carey was excused for cause after answering in the affirmative the first of the three *Witherspoon* questions, thereby expressing an unwillingness to impose the death penalty under any circumstances.

Several days later, the prosecutor informed the court that, upon further reflection, he had determined to withdraw his challenges for cause to the two jurors in question as well as any objection to further efforts by the defense to "rehabilitate" these jurors by further examination. Prospective jurors Ahumada and Carey (who had been sent to another courtroom) were returned to the courtroom. At that point, however, defense counsel declined to engage in further questioning, and the court affirmed the excusal for cause of these two jurors.

Defendant maintains on appeal that, in presenting the two alternatives to defense counsel, the court mischaracterized the defense motion as one to preclude voir dire by either side unless a juror's response was ambiguous; that, accordingly, the court never properly considered the alternative of permitting further inquiry if a juror's response indicated an unwillingness to

impose the death penalty, and that the trial court's ruling barring such inquiry was prejudicial error.

In light of the circumstance that defense counsel declined to ask further questions of these prospective jurors after being provided the opportunity to do so, however, defendant has waived any right to complain of the trial court's initial restriction of voir dire. Accordingly, we need not, and do not, decide whether the trial court's actions were erroneous in any respect.

### 3. *Denial of defense challenges for cause of two prospective jurors.*

■ During jury selection, defendant challenged for cause prospective jurors Kirstenpfad and Cowie. The trial court denied the challenges, and defendant later employed peremptory challenges to excuse these two individuals from serving on the jury. When the defense accepted the jury, it had not exhausted its peremptory challenges. Defendant now urges that denial of his challenges for cause was reversible error under the federal and state Constitutions (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 423-424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; U.S. Const., 5th, 6th, 8th & 14th Amends; Cal. Const., art. I, §§ 1, 7, subd. (a), 15, 16).

In order successfully to claim error in the denial of a challenge for cause of a prospective juror, a defendant on appeal must demonstrate that the ruling affected his or her right to a fair and impartial jury. Because defendant exercised peremptory challenges to remove the two prospective jurors whom he unsuccessfully had challenged for cause, neither of these two prospective jurors possibly could have compromised the impartiality of the jury. Therefore, under *Witt* he cannot claim constitutional error based upon the trial court's denial of those challenges for cause. (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1211 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Mason* (1991) 52 Cal.3d 909, 954 [277 Cal.Rptr. 166, 802 P.2d 950].)

Furthermore, defendant had 11 peremptory challenges remaining when he accepted the jury. Exhaustion of peremptory challenges is a prerequisite to a claim of prejudicial error in the denial of a challenge for cause. (*People* v. *Johnson, supra,* 3 Cal.4th at p. 1211; *People* v. *Morris* (1991) 53 Cal.3d 152, 185 [279 Cal.Rptr. 720, 807 P.2d 949].)[4]

For these reasons, we reject defendant's claim that denial of his challenges for cause affected his right to a fair and impartial jury.

---

[4]Defendant contends the record reflects defense counsel miscounted the number of peremptory challenges remaining to the defense before accepting the jury and that, accordingly, defendant should not be barred from raising this claim despite counsel's failure to exhaust peremptory challenges. The record, however, does not support this contention. Although at one point during the jury selection process, after the prosecution exercised a peremptory challenge, defense counsel expressed his belief that both sides had exhausted their peremptory

#### 4. *The trial court's failure to admonish prospective jurors excused for cause.*

■ Defendant contends the trial court erred, under section 1122, subdivision (b),[5] in failing to admonish certain prospective jurors, after excusing them for cause, not to converse among themselves or with others, and that this failure may have tainted the remaining jury pool, requiring reversal. We disagree. Section 1122, subdivision (b), imposes a duty upon a trial court to give such an admonition once the jury is sworn (see § 1122, subd. (a)). Accordingly, although the giving of the admonition to prospective jurors during the voir dire process constitutes a sound judicial practice, the trial court's omission in this case did not constitute error.

#### 5. *Denial of defendant's motion for separate guilt, special circumstance, and penalty phase juries.*

Defendant contends the trial court erred in denying his motions for separate juries for the guilt, special circumstance, and penalty phases of his trial, thereby violating his rights under the federal and state Constitutions to due process of law, a fair trial by an impartial jury, and an accurate and reliable capital proceeding. Recognizing that section 190.4, subdivision (c), reflects a legislative preference that the guilt, special circumstance, and penalty phases of a capital trial be tried by the same jury (see *People* v. *Rowland* (1992) 4 Cal.4th 238, 268 [14 Cal.Rptr.2d 377, 841 P.2d 897]), we have rejected constitutional challenges to this practice (see *People* v. *Wader* (1993) 5 Cal.4th 610, 648 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People* v. *Johnson, supra,* 3 Cal.4th at pp. 1212-1213). Defendant presents no persuasive grounds for our reconsideration of this issue.

### B. *Right to counsel and self-representation issues.*

Defendant asserts the trial court erred in denying his repeated requests for the appointment of trial counsel of his choice, Andrew Stein (who had represented him at the preliminary hearing), and his request to proceed in

challenges, the trial court immediately corrected that misimpression, advising defense counsel that the prosecution had peremptory challenges remaining (without stating specifically that the defense also had peremptory challenges remaining). In fact, at this point, the defense had 12 peremptory challenges remaining. *Thereafter,* defense counsel exercised an additional peremptory challenge, excusing another prospective juror before accepting the jury, thereby demonstrating that defense counsel was aware he had not previously exhausted his available peremptory challenges.

[5] Section 1122, subdivision (b), provides in part that "[t]he jury shall also, at each adjournment of the court before submission of the cause to the jury, whether permitted to separate or kept in charge of officers, be admonished by the court that it is their duty not to converse among themselves, or with anyone else, on any subject connected with the trial . . . ."

propria persona. Defendant maintains that these rulings, and others, separately and cumulatively violated his rights to the effective assistance of counsel and to self-representation, among other rights guaranteed by the federal and state Constitutions.

A proper understanding of these claims requires that we set forth in some detail the lengthy procedural background leading to the challenged rulings.

On August 9, 1983, at defendant's arraignment in municipal court, Andrew Stein was appointed by the court pursuant to section 987.2 to represent defendant. The public defender's office previously had declared a conflict of interest because of its representation of defendant's two alleged accomplices, Wilson and Cunnigan. On September 26, 1983, at the conclusion of defendant's preliminary hearing, defendant was held to answer on the charges. Stein neither presented a defense nor moved to strike the special circumstance allegations, nor did he make any other posthearing motions.

On October 11, 1983, defendant appeared for arraignment in the Los Angeles County Superior Court before the Honorable Cecil J. Mills. Immediately after the court appointed Walter Barrett to represent defendant, Barrett informed the court that defendant had indicated to him that he did not want Barrett to represent him. The court thereupon instructed defendant that he had two options, one being that Barrett could represent him and the other being that defendant could represent himself. Defendant responded that he wanted Stein as his attorney. The court repeated that Stein would not be available, and reiterated that defendant had the foregoing two options. Defendant replied that he would represent himself. With reference to an application form for self-representation, the court indicated that it would consider such an application, but that Barrett was appointed to represent defendant pending further order of the court.

The court thereupon arraigned defendant. When asked how he pleaded, defendant replied that he preferred not to say anything until such time as Stein was representing him. When the court again reiterated that Stein was not available to represent him, defendant responded that he had nothing to say to the court. The court entered a plea of not guilty on defendant's behalf.

The court then concluded the hearing by explaining to defendant that in the event he desired Stein as his attorney, defendant could retain him, but otherwise Barrett would remain his appointed counsel. Defendant again announced that Barrett was not representing him.

On that same day, Stein filed an ex parte application for reappointment as counsel for defendant, supported by his declaration and a declaration of

defendant. In his declaration, Stein expressed his belief that he had not been reappointed because of a conflict with the presiding judge of the court, who assertedly had told Stein that he would not be reappointed in defendant's case because he had asked an excessive number of questions on cross-examination in the trial of Stein's last homicide case. In his declaration defendant stated that he would not accept, or cooperate with, any attorney other than Stein, whom he trusted, having developed a "close, working relationship" with him.

On October 14, 1983, another hearing was held before Judge Mills, occasioned by a request by Barrett to be relieved from his appointment as counsel for defendant because of health problems. Barrett informed the court that he (Barrett) recently had undergone heart surgery. Expressing the view that the strain of trying a capital case should not be imposed upon Barrett, the court rescinded Barrett's appointment and appointed Leo Newton as counsel for defendant.

Judge Mills then addressed the application of Stein for reappointment as defendant's counsel. The court inquired of defendant regarding his asserted special relationship with the attorney and asked defendant to explain why the appointment of other counsel would not be appropriate. Specifically the court asked whether defendant was knowledgeable as to Stein's background and experience as a trial lawyer and whether Stein ever had represented a defendant in a capital case. Defendant indicated he was unaware of Stein's professional background. Judge Mills explained that, under circumstances where the People were seeking the death penalty, defendant needed to have an attorney who was highly experienced and qualified to present a defense in a capital case, since defendant's life was in jeopardy. The court advised defendant that it would set for hearing Stein's application for reappointment as defendant's counsel, and that at the hearing "Stein can be examined by a judge of this court to determine whether it's appropriate to appoint him," but that Newton would serve as his appointed counsel during the interim period.

The hearing on Stein's application for reappointment went forward on October 25, 1983, before the Honorable William E. McGinley. Stein and a deputy district attorney were present. The court accepted from counsel a transcript of the October 11 proceedings before Judge Mills and indicated it would proceed to review it. The court also stated that it had a transcript of the October 14 proceedings, and that it had reviewed the declarations of Stein and defendant, as well as the points and authorities filed in support of Stein's application. The court requested that defendant state the reasons for seeking the appointment of Stein in place of Newton. Defendant stated simply that he had confidence in Stein's abilities. The court inquired of

Newton whether in his view there was any conflict between Newton and defendant with regard to presentation of the defense. Newton replied that he discerned no conflict.

Stein then spoke in support of his application, explaining that he had expended a significant amount of time on defendant's case in preparing for the preliminary hearing. Stein indicated that he never had tried a death penalty case, but argued that this circumstance did not constitute an adequate ground for denial of his reappointment. Referring to the statements in his declaration, he maintained that a conflict between himself and the then-presiding judge of the Norwalk court had resulted unfairly in the court's failure to reappoint him.

The court then expressed its view that Newton was an experienced criminal defense specialist, having an excellent reputation in the legal community as a trial 'lawyer, and that his appointment by Judge Mills as defendant's counsel did not constitute an abuse of discretion. The court accordingly ruled it would not vacate that appointment, and denied Stein's application for reappointment.

Defendant requested that he be provided 30 days for the purpose of contacting other attorneys, because he would not accept Newton as his attorney. At the court's direction, the court clerk set a trial date of November 30, 1983 (providing defendant with more than the 30 days that he had requested in order to seek other counsel).

On November 3, 1983, at the request of defense counsel, a hearing was held before Judge Mills at which Newton requested the appointment of two physicians to assist him in assessing defendant's mental competence. He explained that he had had great difficulty in communicating with defendant and that defendant refused to speak to him about the case. The court granted Newton's request, appointing two physicians to assist counsel in determining whether there was a basis for a doubt as to defendant's mental competence (within the meaning of sections 1367.1-1368). In response to the court's invitation to comment, defendant stated that he would not cooperate with the physicians, and objected to having an attorney "force[d]" upon him.

On November 28, 1983, Stein filed in the Court of Appeal a petition for writ of mandate, seeking to set aside the trial court's order denying his application for appointment as defendant's counsel. The petition was denied.

On November 30, 1983, before Judge Mills, Newton declared a doubt as to defendant's mental competence, pursuant to section 1368. The court

ordered the proceedings suspended and appointed two physicians to conduct a medical examination of defendant pursuant to section 1368 and to report back to the court regarding the results of that examination. A hearing to determine defendant's mental competence was scheduled for January 10, 1984. The court then acknowledged defendant's oral request to proceed in propria persona, which defendant had communicated to a bailiff, whereupon defendant handed to the judge a written request for Stein's reappointment as his counsel. The court declined to rule on the request, explaining that the issue of Stein's appointment already had been determined by Judge McGinley. The court set defendant's request to proceed in propria persona for hearing on January 10, 1984.

On January 10, at the hearing on defendant's mental competence, the court determined that defendant was mentally competent to stand trial.

Informing the court that defendant had directed him to do so, Newton subsequently moved for the appointment of Stein. The court denied the motion, and then addressed defendant's motion to proceed in propria persona, which defendant proceeded to withdraw.

### 1. *The trial court's refusal to reappoint Stein.*

██ Defendant contends the trial court violated his right to the effective assistance of counsel by denying his request for the reappointment of Stein to represent him in the superior court. A series of judicial decisions of this court have established guiding principles pertaining to an indigent defendant's request for appointment of a particular attorney of his or her choice.

██ The appointment of counsel for indigent defendants under section 987.2 rests within the sound discretion of the trial court. (*Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930 [106 Cal.Rptr. 631, 506 P.2d 1007] (*Drumgo*).) The court's discretion in the appointment of counsel may not be restricted by any fixed policy (e.g., a superior court policy to appoint its "own" counsel in every case [*People* v. *Chavez* (1980) 26 Cal.3d 334, 346 (161 Cal.Rptr. 762, 605 P.2d 401)]). An abuse of discretion is not demonstrated, however, simply by the failure of a trial court to appoint a particular counsel whom the defendant has requested and who is willing to undertake the appointment. (*Drumgo, supra,* 8 Cal.3d at pp. 933-934.)

In *Drumgo, supra,* 8 Cal.3d 930, the defendant moved for the appointment of a particular attorney, Richard Hodge, to represent him at trial, rather than the attorney appointed by the court, on the sole ground of defendant's trust and confidence in Hodge and defendant's lack of knowledge concerning

appointed counsel. There was no showing that Hodge previously had represented defendant, nor any suggestion that any disagreement had arisen with appointed counsel regarding trial tactics or any other aspect of the presentation of the defense. Defendant nevertheless purported to refuse the services of appointed counsel. The trial court denied the motion, finding that court-appointed counsel was competent and that the matters asserted in support of the motion did not provide a basis for termination of the appointment.

In upholding the trial court, this court observed that constitutional and statutory guarantees of the assistance of counsel are not violated simply by the appointment of an attorney other than the one requested by a defendant. (8 Cal.3d at p. 934.) We concluded that the circumstance that the defendant had announced that he would refuse to cooperate with appointed counsel in the preparation of a defense "does not create a situation which entitles an indigent defendant to the appointment or substitution of a particular attorney selected by defendant." (*Id.* at pp. 935-936.)

In contrast, in *Harris* v. *Superior Court* (1977) 19 Cal.3d 786 [140 Cal.Rptr. 318, 567 P.2d 750], we concluded the trial court abused its discretion in declining to appoint the attorneys requested by the defendants who had represented them in related proceedings in municipal court, and in appointing new counsel instead. The *Harris* decision pointed to several factors that the trial court improperly had disregarded in refusing to appoint the attorneys of defendants' choice: the documented fact that the familiarity of former counsel with the issues and witnesses involved in defendants' alleged activities as members of the so-called Symbionese Liberation Army greatly would facilitate the preparation of the superior court case; the circumstance that former counsel not only had represented the defendants in the same proceeding but also in several other criminal cases arising out of these same activities; and the support of newly appointed counsel for the reappointment of former counsel, for the reason that the effort required of new counsel to achieve a level of familiarity with the case comparable to that of former counsel would entail considerable duplicative time and expense to the county—all of which could be avoided by the reappointment of former counsel.

The court in *Harris* concluded that, because the defendants' preference for counsel was supported by objective considerations, and there were no countervailing considerations of comparable weight, it was an abuse of discretion to deny the defendants' request for appointment of counsel of their choice. (19 Cal.3d at p. 799.)

In the present case, defendant's request for appointment of Stein was based upon the subjective factor of his having developed a relationship

of trust and confidence in the attorney in preparation for the preliminary hearing. In support of his reappointment, Stein offered the objective considerations that he had familiarized himself with the case in preparation for the preliminary hearing, having expended approximately 15 hours in conference with defendant. Stein did not demonstrate, however, that he had achieved a familiarity with the issues or evidence that newly appointed counsel would be unable to achieve without considerable duplication of time and effort. At the preliminary hearing, Stein did not present a defense, and there was no indication that he had interviewed witnesses or had undertaken an independent investigation of the relevant evidence. Additionally, Stein never had represented a defendant in a capital case, and there was nothing in the record establishing his experience or qualifications in homicide cases.

Balanced against Stein's familiarity with defendant, and with some of the evidence in the case, was the circumstance of Newton's undisputed excellent reputation as a trial attorney and his qualifications as a criminal law specialist who previously had tried capital cases. Unlike the newly appointed counsel in *Harris* v. *Superior Court, supra*, 19 Cal.3d 786, who supported the reappointment of the defendants' former counsel, Newton sought the appointment, advising the court that he did not discern any conflict of interest. Moreover, when questioned regarding his desire to be represented by Stein, defendant did not indicate that he disagreed with Newton regarding trial tactics or any other aspect of his defense. Under these circumstances, Judge Mills's appointment of Newton instead of Stein, and Judge McGinley's denial of Stein's application for reappointment, constituted proper exercises of discretion.

Defendant contends the record reflects Judge McGinley both failed properly to exercise his discretion in ruling on Stein's application, having conducted the hearing under a misconception that the sole issue was whether Judge Mills had committed an abuse of discretion in appointing Newton, and failed to determine independently the suitability of Stein's requested reappointment.

The record belies defendant's contention. Judge McGinley properly determined that Newton's appointment had been made pending an independent review of Stein's application for reappointment. The determination of the propriety of Newton's appointment in place of Stein necessarily involved consideration of the matters presented in support of Stein's application. Only after the court stated it had reviewed Stein's application and the supporting declarations and points and authorities, and permitted Stein as well as

defendant to speak in support of the attorney's reappointment, did the court deny Stein's application.

Our conclusion that Judge McGinley properly considered Stein's application for reappointment, and that the denial of the application did not constitute an abuse of discretion, precludes defendant's related claim that Judge Mills erroneously determined that Judge McGinley's ruling was binding upon Mills. Judge Mills properly determined that the issue of Stein's appointment had been resolved at the hearing before Judge McGinley and was not subject to independent review by another trial court judge.

Defendant finally contends that under *People* v. *Chavez, supra,* 26 Cal.3d 334, he was entitled to an evidentiary hearing on his request for the reappointment of Stein. *Chavez* simply holds, however, that an indigent defendant desiring the appointment of particular counsel is entitled to be heard on the reasons for his or her preference and to explain the circumstances that might warrant the continued appointment of former counsel. (26 Cal.3d at pp. 347-348.) The record reflects that defendant was provided ample opportunity and did present before both Judge Mills and Judge McGinley his reasons for seeking Stein's reappointment.

For these reasons, we conclude the record fails to support defendant's contention that the trial court's appointment of Newton as defendant's attorney in place of Stein abridged defendant's right to counsel or otherwise constituted an abuse of discretion.

### 2. *The trial court's denial of the Marsden motion.*

██ On January 18, 1985, the date scheduled for commencement of trial, Newton moved for a *Marsden* hearing (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]). Counsel explained that he was in receipt of a document purporting to be a civil complaint for legal malpractice, naming defendant as the plaintiff and Newton and cocounsel Charles Windon as the defendants, and indicated that he construed the complaint as a request for substitution of counsel. Newton expressed his belief that it was necessary to undertake a full hearing pursuant to *Marsden* on each of the grievances defendant had alleged as a ground for relief. Following a hearing, the trial court denied the motion.[6]

Defendant contends the trial court erred in the course of the hearing in refusing to permit him to testify or present evidence in support of his claim

---

[6]Prior to the date of the hearing, at an in camera conference on January 17, 1985, in the trial court's chambers, Stein and another attorney advised the court that defendant had prepared a civil complaint for legal malpractice against Newton and Windon, which likely would necessitate a *Marsden* hearing. The attorneys informed the court that they would be available

of ineffective representation, resulting in a denial of his right to counsel, among other rights guaranteed by the state and federal Constitutions.

■ In *People* v. *Marsden, supra,* 2 Cal.3d at page 124, the seminal case regarding the substitution of appointed counsel, we held that "a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney." For this reason, "[w]hen a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate. Thereafter, substitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel." (*People* v. *Webster* (1991) 54 Cal.3d 411, 435 [285 Cal.Rptr. 31, 814 P.2d 1273]; accord, *People* v. *Freeman* (1994) 8 Cal.4th 450, 480 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].)

■ The record establishes that defendant was afforded ample opportunity to identify and explain the grounds for his dissatisfaction with appointed counsel. The court requested from counsel a copy of the legal malpractice complaint and proceeded to read from this document each of the several grievances alleged, as follows: "1. Defendants promised and agreed to file motions including, but not limited to, motion for order to interview prosecution witnesses; [¶] 2. Defendants further refused to prepare . . . motion for production and inspection. Motion for plaintiff's indigent fund; [¶] 3. Motion to declare a conflict of interest between client and attorney; [¶] 4. Defendants has [sic] further taken a position antagonistic and or adverse to plaintiff['s] interest without plaintiff['s] consent and have failed and or refused to assist in the planning and implementation of defense strategy or plaintiff's defense. The defendants have not and or refused to contact any witnesses for the plaintiff's defense. [¶] 5. Defendants did refuse[] and or failed to perform the sworn obligation of their office in contract with the plaintiff." The complaint further alleged generally that defendants had failed to exercise diligence or skill in their representation of defendant.

for appointment as defendant's counsel if the appointment of Newton and Windon were rescinded.

On January 18, at an in camera conference, Newton and Windon informed the court that defendant apparently was proceeding with a legal malpractice action against them, although the attorneys had not yet been formally served. Newton expressed the view that the lawsuit might impede his representation of defendant. In Windon's view, the lawsuit had been filed for the purpose of facilitating the appointment of Stein in place of Newton and Windon.

Although not clear from the record, the court apparently also received a sworn declaration submitted by defendant, which set forth additional alleged failings on the part of his attorneys.[7]

 We have held, under circumstances in which a defendant has set forth in a "self-contained document" in sufficient detail the basis for his dissatisfaction with appointed counsel, that a "full-blown hearing" on the alleged inadequate representation is not required. (*People* v. *Freeman, supra,* 8 Cal.4th at p. 481; *People* v. *Wharton* (1991) 53 Cal.3d 522, 580 [280 Cal.Rptr. 631, 809 P.2d 290].) In the present case, moreover, not only did the trial court consider defendant's numerous specific written complaints regarding his counsel's performance, but the court additionally provided defendant with ample opportunity to explain further, in the course of the *Marsden* hearing, his grounds for dissatisfaction. After reading the list of alleged grievances, the court inquired of defendant whether he wished to be heard as to any of them. Defendant simply responded that the attorneys "did not perform their duties." After Newton and Windon responded in detail to each of the allegations, explaining and justifying their conduct, the trial court again inquired of defendant whether he wished to be heard. Defendant stated that, although the trial had been scheduled to commence on that date, counsel had failed to undertake an investigation on his behalf to locate witnesses in Chicago. Newton replied that he had retained an investigator for this purpose and that earlier, in the presence of the investigator, defendant had assured counsel that he would provide him with the names of specific witnesses in Chicago who could be interviewed "when the time came." Although counsel had urged defendant that "the time was now," defendant had failed to provide him with the names or any other information regarding these witnesses.

As shown above, contrary to defendant's contention, the trial court did not preclude him from presenting evidence in support of his allegations of incompetent representation. Instead, the court repeatedly inquired of defendant regarding the basis for his complaints and permitted him to respond to his counsel's explanations for their actions.

---

[7]The supplemental clerk's transcript contains a document entitled "Ex-Parte Motion for Substitution of Attorneys and Appointment of Cocounsel and Funds Thereon," accompanied by a declaration of defendant, alleging in part that "Newton has stated, defendant should take the plea bargain offered by the 'People' of life imprisonment without the possibility of parole . . . and that should defendant Horton refuse to accept the plea bargain, he (attorney Newton) was positive defendant Horton would not receive a fair and impartial trial in the judicial district of Norwalk as nine (9) or ten (10) 'white' jurors would certainly influence the others because of the *victim* being white. . . . [¶] . . . That attorney Charles Windon has stated that it's a obvious coverup in this case, but it would never be uncovered, because if I get on the stand to prove my innocence, whatever I say, or do would be completely shadowed-out, once the district attorney brings up my prior murder conviction . . . ."

Nor did the trial court accept at "face value" (as defendant contends) counsel's proffered explanations and justification for their conduct, instead inquiring regarding each listed grievance and then making note of the numerous discovery motions and other pretrial matters that had been filed by defense counsel and that tended to refute defendant's allegations. Indeed, as defendant currently emphasizes on appeal, the prosecution's case hinged primarily upon the testimony of one witness whom defense counsel *did interview* at length in the attorneys room at the county jail.

We conclude defendant was afforded an adequate opportunity to apprise the court in sufficient detail regarding the basis of his dissatisfaction with counsel.

Defendant further contends the court erred in failing to appoint independent counsel to represent him at the *Marsden* hearing. We find no error, defendant having failed to establish even a colorable claim of ineffective representation. (*People* v. *Smith* (1993) 6 Cal.4th 684, 695 [25 Cal.Rptr.2d 122, 863 P.2d 192].)

We conclude the denial of the *Marsden* motion constituted a proper exercise of the trial court's discretion.

3. *The trial court's denial of appointed counsel's motion to withdraw.*

 Defendant contends the trial court erred in refusing to permit appointed counsel to withdraw as counsel for defendant on the asserted ground the filing of the malpractice action created a conflict of interest between defendant and appointed counsel. We conclude the trial court did not err in denying the request to withdraw after determining that the assertion by defendant of frivolous claims of malpractice did not create an actual conflict between the interests of defendant and those of his appointed counsel.

The procedural background pertinent to this claim is as follows. On January 25, 1985, defendant filed in the Los Angeles County Superior Court the civil complaint against Newton and Windon for attorney malpractice, which had been the subject of the earlier *Marsden* hearing. On February 6, 1985, trial in the present case commenced with jury selection. On February 19, 1985, in an unreported ex parte conference, defense counsel informed the court they had been served with the malpractice complaint. Expressing the concern that by virtue of the filing of the complaint, defendant had waived the attorney-client privilege, counsel sought guidance from the court as to

how to proceed, and offered to withdraw. The trial court responded by stating, among other things, that in the court's view the filing of the malpractice action represented another attempt by defendant to manipulate the judicial process and delay his trial. The court indicated that although the action, if not withdrawn, might warrant the removal of appointed counsel, the court would not grant a continuance of the trial date.

In open court, with all counsel present, the court announced that defense counsel had informed the court that a civil action had been filed against them by defendant. Newton stated his belief that the malpractice complaint, containing the allegations that were examined at the prior *Marsden* hearing, created a conflict of interest and requested permission to withdraw as counsel for defendant.

The trial court responded that, although the filing of the complaint technically placed the attorneys in a position adverse to that of their client, the allegations that gave rise to the alleged conflict already had been examined (at the *Marsden* hearing), had been determined to have no merit, and would not justify the removal of appointed counsel. The court stated that the appropriate means available to defendant to challenge that determination was appellate review of the court's ruling. The court further remarked that the record of the numerous minute orders in the proceeding led the court to believe that defendant was seeking to manipulate the system by delaying the proceedings and creating a ground for appellate reversal of any conviction subsequently rendered.

Following Newton's representation that, apart from the complaint, he perceived no conflict between the interests of defendant and those of counsel, the court determined that in fact no conflict of interest existed. The court reasoned that to conclude otherwise would enable a criminal defendant to delay the prosecution indefinitely by resorting to the ploy of filing successive malpractice complaints against appointed counsel. The court indicated, however, that in the event it denied defense counsel's motion to be relieved of their appointment, the court would provide counsel an opportunity to seek writ review of its ruling before impaneling a jury.

On February 25, 1985, the court denied defense counsel's motion to declare a conflict of interest and be relieved as counsel. The court stated its understanding that defense counsel would be seeking writ relief from the ruling unless defendant chose voluntarily to dismiss the complaint. Newton informed the court that he had discussed with defendant the potential adverse consequences that could arise from maintenance of the malpractice action, including waiver of the attorney-client privilege, and that defendant

had agreed to dismiss the action. Newton stated that a request-for-dismissal form was in the process of being prepared for defendant's signature.

On February 26, 1985, Newton informed the court that he was in receipt of a request for dismissal signed by defendant, and then inquired of defendant whether it was his desire to have the document filed with the court. Defendant responded affirmatively and, in response to the court's inquiry whether his decision to dismiss the action had been coerced, replied that it had not been.

 Under the state and federal Constitutions, a criminal defendant has the right to the *effective* assistance of counsel, which includes the right to representation that is free from conflicts of interest. (*People* v. *Jones* (1991) 53 Cal.3d 1115, 1134 [282 Cal.Rptr. 465, 811 P.2d 757].) Conflicts of interest arise in " 'all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests.' " (*Ibid.,* quoting *People* v. *Bonin* (1989) 47 Cal.3d 808, 835 [254 Cal.Rptr. 298, 765 P.2d 460].)

 Defendant's claim that his counsel were burdened by an actual conflict of interest is undermined by the circumstance that defendant voluntarily dismissed the complaint, thereby eliminating any potential conflict of interest.

Moreover, the trial court properly determined, in the exercise of its discretion, that the filing of the complaint did not create any actual conflict of interest necessitating the withdrawal of appointed counsel. Although being named as a defendant in a collateral lawsuit by one's client *may* place an attorney in a situation in which his or her loyalties are divided (*People* v. *Hardy* (1992) 2 Cal.4th 86, 136-137 [5 Cal.Rptr.2d 796, 825 P.2d 781]), a criminal defendant's decision to file such an action against appointed counsel does not require disqualification unless the circumstances demonstrate an actual conflict of interest. (*Id.* at p. 137.) A contrary holding would enable an indigent criminal defendant to challenge each successive appointment of counsel, delaying indefinitely the criminal prosecution. (See *Smith* v. *Lockhart* (8th Cir. 1991) 923 F.2d 1314, 1321, fn. 11 ["We recognize the danger of any holding implying that defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys. [Citation.] *A patently frivolous lawsuit brought by a defendant against his or her counsel may not, alone, constitute cause for appointment of new counsel.*" (Italics added.)].) The trial court's finding that the filing of the complaint represented yet another attempt by defendant to delay his trial and otherwise interfere with the criminal prosecution against him is supported amply by the record.

Counsel represented that, apart from the complaint, they discerned no conflict of interest, and the trial court previously had determined that defendant's allegations of incompetence had no merit. The circumstances apparent to the trial court fail to demonstrate any divergence of the interests of defendant from those of his attorneys, and support the trial court's determination that no actual conflict of interest existed requiring the withdrawal of counsel.

Defendant contends the circumstance that his counsel affirmatively moved to withdraw distinguishes the present case from other cases where, despite the claim of conflict of interest, counsel sought to continue the representation of their client. (See, e.g., *People* v. *Hardy, supra,* 2 Cal.4th 86.) We disagree. The record establishes that appointed counsel moved for leave to withdraw based solely upon their concern that the filing of the malpractice complaint gave rise to a conflict of interest requiring their withdrawal as a matter of law, but that, apart from the filing of the action, their interests and loyalties toward defendant were undivided.

For these reasons, we conclude the trial court's denial of defense counsel's motion to withdraw did not constitute an abuse of discretion.

### 4. *Denial of defendant's Faretta motion.*

Defendant maintains that he unequivocally asserted before three judges his right to proceed in propria persona, and that in denying his requests the court violated his right to self-representation under *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], among other rights guaranteed under the state and federal Constitutions. We conclude the record fails to support defendant's contention.

" '[I]n order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an *unequivocal* assertion of that right within a reasonable time prior to the commencement of trial.' " (*People* v. *Wright* (1990) 52 Cal.3d 367, 409 [276 Cal.Rptr. 731, 802 P.2d 221], italics in the original; *People* v. *Windham* (1977) 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187].) As will be shown, defendant did not assert his *Faretta* rights in an unequivocal and timely manner at any point in the proceedings.

As set forth, *ante,* on October 11, 1983, at the time the court appointed Barrett, defendant asserted that in the event Stein were not appointed, he wished to represent himself. The court directed defendant to complete the necessary application to proceed in propria persona. On October 25, 1983,

the court again advised defendant he could represent himself, but noted defendant had not completed the necessary written application. The court set a trial date of November 30, 1983.

At a hearing on November 3, defense counsel expressed a doubt as to defendant's mental competence, thereby causing the court to appoint two physicians to examine him. At this time, defendant had not completed the in propria persona application.

Prior to November 30, 1983, defendant requested that a bailiff inform the court he wished to proceed in propria persona. On November 30, after defense counsel declared a doubt as to defendant's mental competency pursuant to section 1368, the court expressly acknowledged defendant's oral communication requesting to proceed in propria persona, but stated it declined to act upon that request. Defendant contends the trial court's response constituted a denial of his right to proceed in propria persona. We find no *Faretta* violation on this occasion, however. As a result of the doubt declared as to defendant's mental competency, the criminal proceedings were suspended (see *People* v. *Marks* (1988) 45 Cal.3d 1335, 1340 [248 Cal.Rptr. 874, 756 P.2d 260]). Thus, the court lacked jurisdiction to rule upon defendant's motion (*ibid.*) and accordingly properly declined to do so.

The court scheduled a hearing on defendant's motion for self-representation for January 10, 1984, the same date scheduled for the hearing on defendant's mental competency. Defendant contends the trial court violated his *Faretta* rights at the hearing that went forward on that date. Again, the record fails to support his claim. After determining defendant was competent to stand trial, the court inquired of defendant whether he still desired to have the court rule upon his request for self-representation. Defendant unequivocally stated that he did not, and responded affirmatively when the court inquired whether he sought to withdraw his motion for in propria persona status. The trial court thereupon granted defendant's request to withdraw the motion. Thus, contrary to defendant's contention, the trial court at the January 10 hearing did not deny defendant's request for self-representation or otherwise abrogate his *Faretta* rights.

Defendant contends the settled statement, reflecting the substance of his unreported conversation with Newton following the withdrawal of his motion for self-representation, reflects that his withdrawal was premised upon his assumption that Stein would be appointed as cocounsel, a condition that did not materialize. Again, the record lacks support for defendant's contention and establishes that defense counsel's unreported conference with defendant occurred subsequent to defendant's unconditional withdrawal of his

request to proceed in propria persona. The settled statement relating to the ensuing conference reflects that Newton informed defendant that he would be seeking a 60-day continuance of trial for the purpose of filing a motion for the appointment of cocounsel, and that defendant believed that Stein would be appointed as cocounsel. Defendant's communication with his attorney pertaining to the unrelated matter of the appointment of cocounsel, which occurred after defendant had withdrawn his request for self-representation, however, does not provide a basis for his current assertion of a violation of his *Faretta* rights.

Approximately two months after the January 10 hearing, defendant again asserted his *Faretta* rights. According to a settled statement of unreported proceedings, on March 23, 1984, the Honorable Robert Einstein met in chambers with defense counsel for the purpose of informing them that he had received a note from defendant indicating his desire to proceed in propria persona. Judge Einstein expressed concern regarding the consequences of defendant's self-representation in a complex capital case, and inquired of counsel whether they were aware of any matter that had prompted defendant's request. Newton responded that defendant appeared to have difficulty communicating with counsel, was anxious to ensure the protection of his rights, and desired access to a law library to assist with his defense. The prosecutor objected to granting defendant law library privileges, which generally are available only to defendants having in propria persona status. Judge Einstein indicated his belief that he had the authority to grant defendant law library privileges in the event defendant agreed to withdraw his motion to proceed in propria persona. Defense counsel agreed to discuss the matter with defendant.

On March 27, 1984, at the hearing before Judge Einstein on defendant's motion to proceed in propria persona, Newton and Windon approached the bench and informed the court that defendant had agreed to withdraw his motion for in propria persona status, based upon the court's representation that he would be accorded law library privileges and counsel's representation that they would assist him in obtaining access to pertinent judicial decisions. Thereafter, defendant withdrew his request for in propria persona status, on the condition that he have law library privileges and the assistance of counsel in obtaining law books.

As shown above, contrary to the assertion of defendant that Judge Einstein disregarded his *Faretta* rights, the record reflects that, in an attempt to safeguard defendant's rights incident to his defense, the court provided him an alternative to self-representation, and defendant voluntarily elected that alternative. No violation of defendant's *Faretta* rights has been shown.

On January 18, 1985, the date scheduled for the commencement of trial, defendant again requested to proceed in propria persona after the trial court denied his *Marsden* motion. In denying this motion, the trial court found that defendant's actions demonstrated an attempt to manipulate the judicial process, to obstruct his prosecution, and to delay the trial. The court denied defendant's request to proceed in propria persona for this same reason, and additionally on the ground the request was untimely (having been asserted on the date scheduled for trial after numerous continuances). The court stated: "Now, as far as I'm concerned, while you do have a right to represent yourself in propria persona, that right must be made in a timely and reasonable manner. You made an election agreeing to proceed with the counsel who are representing you now. And the Court finds that it is not timely at this late stage of the game, on the date of trial, to attempt to discharge your attorney by whatever means are available to you, by trying to create a conflict of interest by filing a complaint that is unfounded against them or by moving for pro per status." Although defendant maintained that he was not seeking a delay and was ready to proceed to trial, the court observed that defendant's law library privileges had been revoked (apparently due to an abuse of those privileges). The court expressly doubted defendant's ability to represent himself for more than one day without creating a basis for revocation of his in propria persona status.

The trial court's denial of defendant's request to represent himself, made on the date scheduled for trial (shortly before the actual commencement of trial), after numerous continuances extending over a significant period of time and following defendant's prior assertion and withdrawal of similar requests, constituted a proper exercise of the trial court's discretion. In order to invoke the constitutionally mandated unconditional right of self-representation, a defendant must assert that right within a reasonable time prior to trial. The latter requirement serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice. (*People* v. *Wright*, *supra*, 52 Cal.3d at p. 409.) If the motion is untimely—i.e., not asserted within a reasonable time prior to trial—the defendant has the burden of justifying the delay. (*People* v. *Burton* (1989) 48 Cal.3d 843, 854 [258 Cal.Rptr. 184, 771 P.2d 1270].) "[A] defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial without some showing of reasonable cause for the lateness of the request. In such a case the motion for self-representation is addressed to the sound discretion of the trial court . . . ." (*People* v. *Windham*, *supra*, 19 Cal.3d at p. 128, fn. 5.)

The record amply supports the trial court's action in denying defendant's untimely request after finding a lack of any justification for the

delay. The circumstances here are remarkably similar to those in *People* v. *Williams* (1990) 220 Cal.App.3d 1165, 1170 [269 Cal.Rptr. 705], where the Court of Appeal upheld the trial court's denial of the defendant's belated request for in propria persona status. The court explained that the defendant was able to delay trial "for eight months by juggling his *Faretta* rights with his right to counsel interspersed with *Marsden* motions. He first asserted his right to represent himself and did so until the case was sent out for trial. He then persisted in an attempt to select counsel of his choice. His meritless *Marsden* motions and his civil suit against appointed trial counsel were devised to delay proceedings and allow personal selection of appointed counsel. [¶] Contrary to his assertion on appeal, he never made a timely and unequivocal request to represent himself after abandoning propria persona status when the case was sent out for trial. He was playing the '*Faretta* game[.]' " (*Ibid.*)

For similar reasons, we conclude defendant's claims relating to an alleged violation of his *Faretta* rights have no merit.

5. *Defendant's request for telephone privileges.*

■ Defendant contends the trial court improperly denied his request for telephone access for the purpose of contacting potential defense witnesses, in violation of his rights to a fair trial, to effective assistance of counsel, and to assist in his own defense, among other rights guaranteed under the federal and state Constitutions. The appellate record, however, fails to establish that defendant was denied telephone access or otherwise was precluded from assisting counsel in contacting potential defense witnesses.

On January 18, 1985, at the conclusion of the *Marsden* hearing, defendant requested access to a telephone for one hour each day throughout the trial, in order to enable him to contact witnesses. In response to the court's comment that defense counsel had retained investigators for that purpose, defendant explained that the investigators "could not go to the places that [he] must send them." At this point, Newton interjected that, for this very reason, defendant should provide defense counsel with the names and addresses of potential defense witnesses to enable counsel to attempt to locate them and, if such efforts proved unsuccessful, counsel could report back to the court and seek another solution. The court finally indicated to defendant that "[i]f you will provide the names and addresses of any witness you want your attorneys to contact, I'll have no objection in ordering that you may be permitted to phone call," but explained that defendant first must permit counsel to contact witnesses in an orderly manner through their investigators.

Although current regulations provide that a prisoner should be afforded reasonable telephone access while incarcerated (Cal. Code Regs., tit. 15, § 1067), the record fails to indicate that defendant was denied the same reasonable access that was afforded other prisoners. The trial court simply refused to grant unconditionally the special telephone privileges that were sought by defendant but not by his counsel. Defendant maintains that his right to an effective defense included the right to assist his counsel in contacting witnesses. Appointed counsel were in control of preparing the defense, however, and they did not seek special privileges for their client and never indicated to the court that special telephone access was necessary for the preparation of an adequate defense.

Moreover, the court did not deny absolutely such privileges, but simply conditioned the privilege of special access upon defendant's cooperation with defense counsel. The court's condition was reasonable under the circumstances where defendant had not asserted a timely, unequivocal right to self-representation and was represented by counsel. In imposing the condition, the court properly sought to enable appointed counsel to fulfill their duties and to prevent defendant from impeding the preparation and implementation of the defense. Thus, the court's ruling reflected an appropriate concern that defendant would use telephone privileges to circumvent the efforts of his counsel. Where appointed counsel were in control of the defense, neither the court nor counsel were compelled to manage the case according to defendant's whims (see *People* v. *Lucky* (1988) 45 Cal.3d 259, 281 [247 Cal.Rptr. 1, 753 P.2d 1052]). We find no abuse of discretion.

 C. *The stipulation to the court commissioner presiding over defendant's trial.*

■ Commissioner Cowell presided over defendant's trial, acting as a temporary judge (see Cal. Const., art. VI, § 21). Defendant renews the identical claim that he asserted in a prior habeas corpus petition filed in this court, namely that he never stipulated to the appointment of a court commissioner to preside at his trial and that, accordingly, Commissioner Cowell's exercise of jurisdiction over his case violated various of his rights under the state and federal Constitutions. In *In re Horton* (1991) 54 Cal.3d 82, 86 [284 Cal.Rptr. 305, 813 P.2d 1335] (*Horton I*) we rejected this claim, holding that when defense counsel proceeded to trial without objection, knowing that the judge was a court commissioner, the stipulation necessary to vest the commissioner with authority to try the case could be inferred from the conduct of counsel. Our holding in *Horton I* is binding under the doctrine of law of the case (*People* v. *Mattson, supra,* 50 Cal.3d 826, 850; *People* v. *Shuey* (1975) 13 Cal.3d 835, 842 [120 Cal.Rptr. 83, 533 P.2d 211]) and therefore precludes defendant's current claim on appeal.

Defendant contends that the evidence in the appellate record, allegedly indicating a total breakdown of the attorney-client relationship at the time of the commencement of the trial, serves to rebut any inference that he stipulated to the appointment of a court commissioner. The asserted lack of communication between defendant and appointed counsel, however, does not undermine our holding in *Horton I, supra*, 54 Cal.3d 82, that the attorney's conduct *alone* amounted to a de facto stipulation (*id.* at pp. 92-93). Under *Horton I*, the attorney's conduct determines the validity of the de facto stipulation. Accordingly, we reject this constitutional challenge to Commissioner Cowell's action in presiding over defendant's trial.

 D. *Claims relating to the trial court's finding that McLaurin was not an accomplice as a matter of law.*

 Following the presentation of the prosecution's case-in-chief, the defense moved to strike the testimony of Foo McLaurin and for judgment of acquittal (§ 1118.1) based upon section 1111,[8] which provides that a conviction cannot be based upon the testimony of an accomplice unless that testimony is corroborated by other evidence connecting the defendant to the crime. The defense argued that the prosecution's evidence established McLaurin was an accomplice to the crimes, and that his testimony inculpating defendant was not corroborated independently by any other evidence. The trial court denied the motion to strike as well as the motion for acquittal. Subsequently, the court concluded the evidence established as a matter of law that McLaurin was not an accomplice, and accordingly refused the jury instructions proffered by the defense relating to accomplice testimony (CALJIC Nos. 3.10, 3.11, 3.12, 3.13, 3.16, and 3.18), including instructions stating that accomplice testimony requires corroboration.

Defendant contends the trial court erred both in denying the motion to strike and in refusing to instruct the jury on accomplice testimony. We find no error.

 Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." In order to be chargeable with the identical offense, the witness must be considered a principal under section 31. That statute defines principals to include "[a]ll persons concerned in the commission of a crime . . . whether they directly

---

[8]Section 1111 provides in part that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ." (§ 31; see *People* v. *Fauber* (1992) 2 Cal.4th 792, 833-834 [9 Cal.Rptr.2d 24, 831 P.2d 249].) A mere accessory, however, is not liable to prosecution for the identical offense, and therefore is not an accomplice. (*People* v. *Fauber*, *supra*, 2 Cal.4th at pp. 833-834; *People* v. *Hoover* (1974) 12 Cal.3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760].)

If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony. (*People* v. *Fauber*, *supra*, 2 Cal.4th at p. 834.) But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony. (*People* v. *Hoover*, *supra*, 12 Cal.3d at p. 880.)

 McLaurin's uncontroverted testimony established that on the day preceding the commission of the crimes, over a period of approximately 10 to 12 hours, defendant and his companions steadily ingested large quantities of cocaine. When their supply was depleted, defendant suggested acquiring more drugs by robbing his dealer, as reflected in the following colloquy between the prosecutor and McLaurin: "[Q.] What was [defendant's] plan on how he was going to get more cocaine? . . . [¶] . . . [A.] We needed more cocaine. . . . At that point in time he was to do—we had no choice—to try to make some kind of robbery. [¶] [Q.] Did he say who he was thinking about robbing? [¶] . . . [A.] I guess his dope pusher. His dope pusher. He said maybe he go get his drugs from. . . . [¶] . . . [Q.] Did he ask you to do anything about this crime? [¶] [A.] No, he didn't. Oh yeah. At the time, you know, he wanted me to use the wheels, you know— [Q.] To use the wheels? [¶] [A.] To use my girlfriend's wheels, car, to transport him over there. [¶] [Q.] Did you agree to do that? [¶] [A.] At that time, yes, I did. But then my girlfriend—I asked my girlfriend, and she said no, she wanted to go home, you know." When his girlfriend refused to loan him her vehicle, McLaurin abandoned any further action in pursuit of obtaining more drugs, and departed with his girlfriend. The next morning he went to his job.

After rejoining defendant and defendant's companions on the afternoon after the robbery and murder were committed, McLaurin, accompanied by Cunnnigan, returned to defendant's abandoned vehicle and retrieved some drugs and other items. McLaurin ultimately drove defendant to a bus depot.

At trial, in moving to strike McLaurin's testimony, defense counsel relied upon the witness's testimony on direct examination that, because the men

needed more cocaine and had no money, they had "no choice" but "to try to make some kind of robbery." Defense counsel also focused upon the following testimony of McLaurin on cross-examination: "[Q.] Well, let me ask you this. Weren't you ready to go down and do that that very evening, go down and rip off that dope dealer? [A.] By me being under the influence of that drug and I needed more dope and money at that time, yes, I did. [¶] [Q.] Isn't it a fact that the only reason you didn't is because your girlfriend wouldn't let you? [¶] [A.] That's true."

The foregoing testimony, according to defense counsel, demonstrated the witness's knowledge of and intent to assist in the perpetration of the crime. The trial court, however, found that the witness's candid testimony, given in response to a question regarding his state of mind while at defendant's apartment, indicated merely that he hypothetically might have been willing to participate in such a crime. The court construed the witness's testimony as, " 'Yes, I did consider myself to be in a frame of mind where I might have participated,' " but in fact he did not participate in the commission of the actual offense that occurred the following day. The court concluded that McLaurin's speculation regarding what he might have done that evening, had his girlfriend made her vehicle available, did not provide a sufficient basis to establish that McLaurin was an accomplice to the crimes ultimately committed by defendant at a later point in time without McLaurin's knowledge or participation.

Finally, the defense relied upon McLaurin's testimony that, following commission of the crimes, McLaurin shared in the proceeds (cocaine) and assisted defendant in his flight from the area by driving him to the bus depot.

Defendant contends the cumulative evidence of McLaurin's knowledge and encouragement of the robbery, as well as his retrieval of the crime proceeds and his having aided defendant's departure from the area, constituted sufficient evidence from which the jury could infer McLaurin's accomplice status.

We find no error. McLaurin's mere initial agreement to drive defendant to the dealer's apartment *the prior evening,* an arrangement that never was carried out, did not constitute evidence of McLaurin's having planned, encouraged, or instigated the commission of a robbery or any other crime committed by defendant at a future time. McLaurin's objective apparently was to obtain more drugs on the evening of October 10, but the plan to do so was aborted. His knowledge that a crime might be committed by defendant in the future did not amount to aiding and abetting the commission of that prospective crime. (See *People* v. *Weber* (1948) 84 Cal.App.2d 126, 130

[190 P.2d 46]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, § 83, pp. 98-99.) Although the evidence of his conduct subsequent to the commission of the crimes might well have implicated McLaurin as an accessory, his status as accessory would not subject him to accomplice liability.

The decisions cited by defendant in support of his position áre inapposite. For example, in *People* v. *Hamilton* (1989) 48 Cal.3d 1142 [259 Cal.Rptr. 701, 774 P.2d 730], this court held the jury properly was instructed to determine whether a sister of the defendant was an accomplice to a murder in light of the evidence that the sister had agreed to help another sister of the defendant kill the victim, had suggested the type of weapon that should be used and, after moving from California to Texas, when contacted by telephone again agreed to assist in the murder, although she never returned to California or took any other action in furtherance of the crime. (*Id.* at pp. 1168-1170.) In contrast, in the present case McLaurin agreed only to assist defendant in his plan to rob defendant's drug dealer on the evening of October 10, by driving defendant to the dealer's apartment. As shown, that plan was abandoned. McLaurin never agreed to assist, nor took any action in furtherance of, the commission of the crimes subsequently committed by defendant.

Because neither the undisputed facts nor the inferences to be drawn therefrom would support the prosecution of McLaurin as an accomplice for the offenses at issue in this case, the trial court properly determined that, as a matter of law, McLaurin was not an accomplice.

Moreover, even were McLaurin an accomplice to the crimes, there clearly was sufficient corroborating evidence connecting defendant to the commission of the crimes—primarily the hammer that was identified as the murder weapon and that was traced to defendant through the testimony of Michael Graham and Willie Dorn, as well as defendant's abrupt departure from the vicinity immediately after the commission of the crimes, followed by his concerned telephone inquiries regarding whether the police were looking for him. Under these circumstances, the trial court's refusal to leave to the jury the question of McLaurin's accomplice status could not, in any event, be prejudicial.

### E. *Denial of defense motion for acquittal.*

As set forth in part D., *ante,* following the presentation of the People's case defendant unsuccessfully moved for judgment of acquittal pursuant to section 1118.1. Defendant renewed his motion after both sides had rested,

and again in conjunction with a motion for new trial. On each occasion his motions were denied.

Challenging the denial of his motions for judgment of acquittal, defendant maintains that, absent the assertedly uncorroborated accomplice testimony of Foo McLaurin, the evidence was insufficient to sustain on appeal defendant's conviction of the crimes. As we have just explained, however, McLaurin's testimony properly was admitted and was corroborated by independent evidence. Accordingly, the trial court did not err in denying the motions for judgment of acquittal.

F. *The trial court's rejection of defense instructions relating to specific intent.*

Defendant contends the trial court erred in refusing two jury instructions requested by the defense—a special instruction formulated by the defense and former CALJIC No. 8.79—relating to whether defendant's mental or physical condition prevented his forming the specific intent necessary to establish his commission of the charged offenses.[9] At trial, defense counsel argued that the evidence of defendant's voluntary intoxication resulting from his ingestion of excessive amounts of cocaine warranted the proffered instructions as bearing upon the issue whether defendant formed the specific intent relevant to the crimes charged. In rejecting the instructions, the trial court observed that, although evidence was presented relating to defendant's use of cocaine on the day preceding the commission of the crimes, there was no testimony or other evidence relating to his diminished capacity or any other state of mind at the time the crimes were alleged to

---

[9]Defense counsel's special instruction provided in part as follows: "Requirement of specific intent or mental state as an element of proof. [¶] The defendant is charged with a crime which requires that a specific intent to commit the crime or mental state be established beyond a reasonable doubt . . . . You must therefore determine from all of the evidence if at the time the crime was allegedly committed, the defendant's mental or physical condition, however caused, prevented him from forming the specific intent or mental state necessary to establish either the crime or the degree of the crime with which he is charged. [¶] If from all the evidence you have a reasonable doubt whether defendant was capable of forming this specific intent or mental state, you must give the defendant the benefit of that doubt and find that he did not have this specific intent or mental state."

Former CALJIC No. 8.79 provided: "Before the defendant may be found guilty of the unlawful killing of a human being as a result of the commission or attempt to commit the crime of _____, you must take all the evidence into consideration and determine therefrom if, at the time of the commission or attempt to commit such crime, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent to commit such crime. [¶] If from all the evidence you have a reasonable doubt whether the defendant was capable of forming such specific intent, you must give the defendant the benefit of the doubt and find that he did not have such specific intent."

have occurred. The court further concluded that, without expert witness testimony as to the effects of cocaine consumption upon defendant's mental state, there was no basis for giving the requested intructions.

Defendant asserts that, because specific intent was an element of the charged offenses of murder and robbery, the trial court was obligated to instruct on whether defendant actually formed the requisite specific intent. Defendant maintains that, because evidence of voluntary intoxication was relevant to show he did not have the required intent to rob or murder Bowser, the trial court erred in refusing the defense instructions, thereby denying defendant the opportunity to present the defense that, as a result of voluntary intoxication, he lacked the requisite intent.

Defendant contends the asserted error was compounded by the trial court's instruction, pursuant to former CALJIC No, 3.34,[10] informing the jury that "[t]he intent with which an act is done is shown [by] . . . the soundness of mind . . . of the person committing the act," and that "[f]or the purposes of the case on trial, you must assume that the defendant was of sound mind at the time of his alleged conduct." It is defendant's position that the giving of this instruction, in the absence of the instructions requested by the defense relating to defendant's lack of specific intent by virtue of his intoxication, operated to shift the burden of proof on the issue of intent to defendant, while preventing him from meeting that burden by establishing that he lacked the intent required for the offenses, as a result of intoxication.

We conclude the trial court did not err in refusing the instructions requested by the defense. Preliminarily, it should be noted that the proffered instructions—regarding whether, as a result of defendant's mental or physical condition, he had the *capacity* to form, or was *prevented from* forming, the requisite specific intent or mental state—technically were improper in that they pertained to the theory of "diminished capacity." The defense of diminished capacity was abolished by legislative enactments in 1981, prior to the commission of the crimes in the present case in 1982. (Stats. 1981, ch. 404, pp. 1591-1592; see *People* v. *Saille* (1991) 54 Cal.3d 1103, 1111-1112 [2 Cal.Rptr.2d 364, 820 P.2d 588].) As part of this legislative enactment, section 22 was amended to provide that "[e]vidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged" (§ 22, subd. (a)), and that "[e]vidence of voluntary

---

[10]Former CALJIC No. 3.34 provided in pertinent part: "The intent with which an act is done is shown as follows: [¶] . . . [¶] By the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act. [¶] For purposes of the case on trial, you must assume that the defendant was of sound mind at the time of his alleged conduct which, it is charged, constituted the crime charged in the information."

intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 22, subd. (b); see *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1178 [270 Cal.Rptr. 286, 791 P.2d 965] [trial court properly refused to instruct under former CALJIC No. 8.41, an instruction dealing with the effect of diminished capacity caused, for example, by voluntary intoxication].)

Notwithstanding the abolition of the diminished capacity defense, evidence of voluntary intoxication is relevant to the extent it bears upon the question whether the defendant *actually* had the requisite specific mental state required for commission of the crimes at issue. (See *People* v. *Saille*, *supra*, 54 Cal.3d at pp. 1108, 1115-1116.) Even had the instructions requested by the defense been rephrased to pertain specifically to evidence of voluntary intoxication as bearing upon whether defendant *actually* formed the intent or mental state to rob or murder, however, the record supports the trial court's determination that the evidence at trial was insufficient to warrant the giving of such instructions.

At the guilt phase of the trial, the defense did not introduce any evidence as to defendant's mental state at the time the murder and robbery allegedly occurred, or any evidence that would have informed the jury regarding the effect of defendant's freebasing cocaine on his actual formation of the specific intent and mental state involved in robbing, killing, premeditating, or deliberating, or any other mental state relevant to the crimes charged. Defendant contends, however, that the evidence presented by the prosecution at the guilt phase was sufficient to support the giving of such an instruction.

We disagree. Although McLaurin's testimony indicated that both McLaurin and defendant had freebased cocaine on the day prior to the commission of the crimes, McLaurin was not present with defendant at the time the crimes occurred, and he provided no testimony with regard to whether defendant was intoxicated at that time. Moreover, the additional evidence presented by the prosecution concerning the circumstances surrounding the robbery and murder did not suggest that the perpetrator lacked the specific intent or mental state required to commit the crimes. To the contrary, the circumstantial evidence indicated that the crimes were carried out in accordance with a predesigned plan, and McLaurin's testimony relating the statements made by defendant following the murder and robbery helped support a finding that defendant was fully aware of his actions and intended their fatal consequences.

Accordingly, we conclude the trial court properly found the evidence insufficient to warrant an instruction directing the jury to consider the effect

of intoxication with regard to whether defendant actually formed the specific intent or other mental state relevant to the commission of the charged offenses. This conclusion undermines defendant's related claim pertaining to the instruction corresponding to former CALJIC No. 3.34. That instruction directed the jury's attention, in determining intent, to "the circumstances attending the act, the manner in which it [was] done, the means used," as well as "the soundness of mind" of the defendant. Because the defense presented no evidence relating to defendant's voluntary intoxication at the time of the commission of the crimes, the instruction's reference to "soundness of mind," and its "assumption" that defendant was of sound mind, likely would have been understood by a reasonable juror as pertaining only to defendant's sanity, and would not have misled a reasonable juror with regard to the separate issue whether, in light of the evidence of intoxication, defendant harbored the requisite mental state or specific intent to murder or rob. (See *People* v. *Mickey* (1991) 54 Cal.3d 612, 669-671 [286 Cal.Rptr. 801, 818 P.2d 84] [a reasonable juror would have understood the presumption under former CALJIC No. 3.34 as pertaining to sanity].)

For these reasons, we conclude the trial court did not err in refusing the instructions on intoxication requested by defendant.

### G. *Jury instruction on reasonable doubt.*

Defendant challenges the trial court's instruction on the reasonable doubt standard. The United States Supreme Court has upheld the constitutionality of this instruction, CALJIC No. 2.90, the standard reasonable doubt instruction in California. (*Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], affirming *People* v. *Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862].) As we recently recognized in *People* v. *Freeman, supra,* 8 Cal.4th 450, 501, although the instruction could be improved upon, the giving of such an instruction provides no basis for reversal of a conviction.

### H. *Defendant's absence from court proceedings.*

 Defendant contends he was improperly excluded from proceedings convened to read back the testimony of prosecution witnesses at the jury's request, and from six in camera conferences. Defense counsel stipulated to the reading back of this testimony in the absence of the court or counsel, and did not seek defendant's presence at the in camera conferences. Defendant now challenges the effectiveness of counsel's express or implied waiver of defendant's presence.

 As we previously have observed in rejecting similar guilt phase contentions, a "defendant is not entitled to be personally present during

proceedings which bear no reasonable, substantial relation to his or her opportunity to defend the charges against him, and the burden is on defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial." (*People* v. *Hovey* (1988) 44 Cal.3d 543, 585 [244 Cal.Rptr. 121, 749 P.2d 776]; accord, *People* v. *Medina* (1990) 51 Cal.3d 870, 902 [274 Cal.Rptr. 849, 799 P.2d 1282]; *People* v. *Garrison* (1989) 47 Cal.3d 746, 782 [254 Cal.Rptr. 257, 765 P.2d 419]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 359-360 [233 Cal.Rptr. 368, 729 P.2d 802].) The foregoing rule applies to defendants in capital homicide prosecutions as well as to those in noncapital cases. (See *People* v. *Freeman*, *supra*, 8 Cal.4th at p. 479; *People* v. *Pride* (1992) 3 Cal.4th 195, 251 [10 Cal.Rptr.2d 636, 833 P.2d 643].) The reading back of testimony ordinarily is not an event that bears a substantial relation to the defendant's opportunity to defend (*People* v. *Medina*, *supra*, 51 Cal.3d at p. 903; *People* v. *Garrison*, *supra*, 47 Cal.3d at p. 782; *People* v. *Hovey*, *supra*, 44 Cal.3d at p. 585), and nothing in the present record indicates that defendant's personal presence would have assisted the defense in any way. The lack of replication of the witnesses' original intonations and presentation, of which defendant complains, would not have been altered by defendant's presence, and his suggestion that the jury might have been favorably influenced by defendant's reactions to the reading back of the testimony is entirely speculative.

Defendant also asserts he was prejudiced by the reading back as a result of the court reporter's having read the complete trial transcript, including questions and answers to which objections were sustained or which were ordered stricken. According to the pertinent settled statements, the court reporters read back to the guilt phase jury "testimony" from various witnesses, and "[t]he court reporters did not delete from their readbacks questions and answers as to which objections were sustained or as to which a Motion to Strike was granted." The jury was instructed, however, pursuant to CALJIC No. 1.02, that "[a]s to any question to which an objection was sustained, you must not guess what the answer might have been or as to the reason for the objection," and "[y]ou must not consider for any purpose any offer of evidence that was rejected, or any evidence that was stricken out by the court; such matter is to be treated as though you never heard it." We must presume the jury heeded the instruction and disregarded the stricken material, as it was required to disregard such material when originally presented during the course of the testimony. For these reasons, we conclude the record fails to support defendant's claim of prejudice resulting from the reading back of testimony.

 ██ As for defendant's related contention that he was denied his right to be present at trial by his exclusion from various in chamber

conferences (including the court's conference with Attorneys Stein and Charvet on the day preceding the *Marsden* motion, and the conference with Attorneys Newton and Windon immediately preceding that motion), this court in a series of decisions has rejected similar contentions, holding: " '[T]he accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which defendant's presence does not bear a "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' " (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1080 [259 Cal.Rptr. 630, 774 P.2d 659]; accord, *People* v. *Medina, supra,* 51 Cal.3d at p. 902; *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1116 [269 Cal.Rptr. 530, 790 P.2d 1327]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1027 [264 Cal.Rptr. 386, 782 P.2d 627].) Defendant fails to explain how his attendance at the conferences in question would have benefitted the defense or otherwise altered the outcome of his trial. Defendant's claim that his exclusion bore a substantial relation to his opportunity to defend therefore must fail.

### I. *Ineffective assistance of counsel.*

Defendant contends he was deprived of effective assistance of counsel during the guilt phase of his trial. ▇▇▇ To establish constitutionally inadequate representation, a defendant must establish that (1) counsel's representation was deficient, i.e., fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's representation subjected the defendant to prejudice, i.e., a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1058 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].) "When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of the representation provided by counsel. 'If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," [citation], the contention must be rejected.' " (*People* v. *Mitcham, supra,* 1 Cal.4th at p. 1058.) ▇▇▇ For the reasons that follow, we conclude that defendant has failed to meet his burden of establishing, on the record before us, that his trial counsel was ineffective.

Defendant first complains of his counsel's failure to inform him of his right to be tried before a superior court judge rather than a court commissioner. We previously have determined, however, that defendant was not

denied any fundamental constitutional right when he was tried before a court commissioner sitting as a temporary judge, and that his counsel had the authority to stipulate on his behalf to the case being tried by a commissioner. (*Horton I, supra,* 54 Cal.3d 82, 92-93.) Because the record fails to suggest that the determination to have the case tried by a commissioner rather than a judge adversely affected the defense or resulted from negligence by counsel rather than an informed decision, counsel's asserted failure to inform defendant of this right does not establish that defendant was deprived of effective assistance.

Defendant next complains of counsel's conduct at the in camera conference immediately preceding the hearing on defendant's *Marsden* motion, where counsel assertedly characterized the allegations of defendant's complaint as without merit. The settled statement of the unreported conference, however, does not support defendant's claim, reflecting instead that counsel expressed concern that a malpractice complaint might impede their representation of defendant, and the view that the complaint was motivated by defendant's desire to have Stein represent him. ▪▪▪ A defendant's expression of dissatisfaction with appointed counsel, necessitating a *Marsden* hearing, does not compel counsel to concede the allegedly inadequate representation but rather requires counsel to respond truthfully to those allegations. One of the purposes of a *Marsden* hearing is to afford counsel the opportunity to address the defendant's concerns with respect to the defendant's representation and to explain counsel's performance. ▪▪▪ In the present case, counsel urged the court to examine each of the allegations of incompetence set forth in the complaint, and, at the *Marsden* hearing, attempted to explain their performance with regard to each of the expressed concerns. We view counsel's conduct as objectively reasonable under prevailing professional norms.

Defendant also challenges counsel's performance during jury voir dire. He first asserts counsel was incompetent in failing to inquire regarding the jurors' possible racial bias. The record fails to establish, however, that counsel's failure to voir dire individual jurors on the sensitive issue of racial bias was not the result of a sound tactical decision, such as a determination that the question that counsel did pose to prospective jurors—whether, if they were the defendant, they would want the case decided by someone who thought the way they did—was more likely to disclose prejudice or bias rather than a direct question regarding racial bias. Defendant's claim of incompetence on this ground therefore must fail.

Defendant complains that counsel miscounted the number of peremptory challenges remaining to the defense before accepting the jury. The settled

statement of a sidebar conference among the court and counsel during voir dire (see fn. 4, *ante*), however, reflects that defense counsel's misimpression as to the availability of peremptory challenges was corrected by the trial court, and that counsel in fact thereafter exercised an additional peremptory challenge before accepting the jury.

Defendant questions counsel's failure to inform the jury during voir dire that intent to kill was an element of the felony-murder special circumstance. Although an inquiry by counsel regarding a juror's views relating to the element of intent to kill in relation to a felony-murder special circumstance might be warranted during the voir dire process, counsel's obligations during voir dire do not include fully instructing the jury on the governing law, that being an exclusive function of the trial court. The trial court did instruct the jury that in order to find true the special circumstance charged under section 190.2, subdivision (a)(17)(i), it had to find that defendant possessed the intent to kill (as required at the time of trial by *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 142 [197 Cal.Rptr. 79, 672 P.2d 862], overruled by *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]), and counsel's decision not to raise this issue on voir dire does not establish ineffective assistance.

Defendant asserts that counsel was incompetent in stating during voir dire that the jury "must" impose a death sentence if it found the aggravating circumstances outweighed the mitigating circumstances. Regardless whether counsel's comments by themselves fully and accurately informed the jury as to the deliberative process on the matter of penalty, counsel's general comments were not intended or represented to comprise the full instructions given at the end of the trial. The trial court properly instructed the jury at the penalty phase regarding its duties in arriving at a determination as to the appropriate punishment, and defendant fails to establish that he was prejudiced by counsel's remarks. (See *People* v. *Livaditis* (1992) 2 Cal.4th 759, 780-781 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

Defendant next complains of counsel's failure to attempt to impeach McLaurin's testimony with expert testimony on the effect of drug abuse on memory and perception. Regardless whether counsel's strategy in this regard was consistent with prevailing professional norms, however, defendant fails to demonstrate any possible prejudice. McLaurin testified regarding his extensive drug use during the relevant time period and demonstrated an inability to recall with any specificity the substance of conversations or the sequence of events. His repeated testimony, in response to questioning, that he was unable to recall his whereabouts on pertinent dates or even his own address, among other significant memory lapses, served the same purpose as would have expert testimony of the nature suggested by defendant.

Defendant also faults counsel for failing to seek to impeach McLaurin's testimony with that witness's prior felony convictions for drug-related offenses, which were disclosed at defendant's preliminary hearing. The jury, however, was presented with uncontroverted evidence regarding McLaurin's extensive drug use, and through McLaurin's direct testimony learned of the circumstance that he was on probation for a criminal conviction. Defendant fails to establish on the record before us that use of McLaurin's prior felony convictions would have brought about a result more favorable to the defense.

Defendant disputes counsel's failure to introduce expert testimony tending to establish that defendant's long-term drug use "would have made it impossible" for him to form the specific intent to commit the charged offenses, which testimony also would have supported the instruction requested by the defense regarding diminished capacity (an instruction refused by the trial court). The defense presented was that defendant did not commit the crimes, and evidence as to the effect of defendant's drug usage upon his ability to form a specific intent would have been inconsistent with that defense. Defense counsel, however, may have determined as a tactical matter that the presentation of such evidence would have diminished the effectiveness of the defense that someone other than defendant committed the crimes.

Defendant next contends that defense counsel was incompetent in refusing to permit him to testify because of counsel's alleged erroneous belief that defendant's prior murder conviction was admissible to impeach his testimony. The basis for defense counsel's decision not to place defendant on the stand, however, is not disclosed affirmatively on the record. Because defendant's failure to testify may have been the result of a sound tactical decision on the part of defense counsel, defendant has failed on the record before us to establish that he was deprived of effective representation due to his failure to take the stand.

Defendant also faults defense counsel for failing to object to the hearsay testimony of Sergeant LaPorte regarding the contents of a police investigative report. Defendant's contention, however, fails to recognize that this testimony was elicited on direct examination *as part of the defense case-in-chief*, and tended to suggest a weakness in the chain of custody of the murder weapon. Defendant accordingly fails to demonstrate that counsel's omission was not the result of a reasonable defense strategy.

Defendant asserts that "[d]efense counsel failed to object to the prosecution's misrepresentation of McLaurin's testimony during closing argument," but fails to identify the testimony of McLaurin that purportedly was misrepresented or the legal basis for an objection. His claim therefore must fail.

Defendant's complaint regarding counsel's failure to object to the trial court's instruction and the prosecution's argument on flight is undermined by the uncontroverted evidence of defendant's abrupt departure shortly after the commission of the crimes, justifying the argument and instruction on flight. (§ 1127c.)

Finally, defendant claims his counsel were incompetent in failing to object to the procedure followed by the trial court with respect to the reading back of testimony, and in failing to inform him regarding that procedure. The choice of the procedure to be recommended to the trial court, however, is a tactical decision within the control of counsel, not requiring a personal waiver by the defendant (*People* v. *Pride, supra,* 3 Cal.4th 195, 251), and defendant fails either to establish that counsel's omission fell below the standard of reasonable representation or to demonstrate prejudice.

For these reasons, defendant has failed to establish, on the record before us, that he was deprived of the effective assistance of counsel at the guilt phase of the proceedings.

V. *The Special-circumstance-phase Issue: The Trial Court's Denial of the Motion to Strike the Special Circumstance Allegation of a Prior Murder Conviction*

 After the commencement of the guilt phase of the trial, the defense filed a motion to strike the special circumstance allegation of defendant's 1973 murder conviction, asserting that numerous alleged errors of federal constitutional dimension rendered that conviction constitutionally invalid. The hearing on the motion was held shortly before the close of the guilt phase.

In support of the motion, defense counsel submitted segments of transcripts of the earlier case, establishing that in 1971, proceedings were instituted in the juvenile division of the Circuit Court of Cook County, in the State of Illinois, charging defendant (then 16 years of age) and 3 codefendants with the gang-related murder of another youth. Thereafter, defendant, as well as his three codefendants, was found to be unsuitable for prosecution as a juvenile, and the proceedings were transferred to the criminal division of the court. The public defender was appointed to represent defendant but, after a determination that there was a potential conflict among the interests of the four defendants, was relieved of appointment as counsel for three of the defendants. Mr. Joseph Malek, a private attorney, was appointed to represent defendant. The record indicates that Malek's total compensation for his representation of defendant in the Illinois trial proceedings was $250.

The trial of two of the defendants was severed from that of defendant and codefendant Golden. Golden was represented by Attorney Charles Nixon. Malek did not present any witnesses to testify on behalf of defendant. Counsel for codefendant Golden, however, presented several witnesses, some of whom provided an alibi defense for Golden. At the conclusion of the trial, defendant was convicted of murder and Golden was acquitted of that charge.[11]

In the present California proceedings, at the hearing on defendant's motion to strike, defense counsel asserted numerous violations of defendant's constitutional rights in the Illinois proceedings, as follows: (1) failure to provide a constitutionally adequate fitness hearing; (2) denial of the right to counsel at the juvenile proceedings, during plea negotiations, and at critical stages of the trial; (3) speedy trial violations; (4) violation of the right to unconflicted counsel; and (5) ineffective assistance of counsel. He also asserted that, as a result of these numerous errors, the prior proceedings resulted in a miscarriage of justice.

With respect to the claim of denial of counsel at the juvenile proceedings, the defense submitted a declaration of defendant stating that following his arrest, in the juvenile proceedings, defendant never spoke to an attorney and to his knowledge had not been appointed counsel. An addendum subsequently filed by the defense, however, reflected that in fact defendant did have counsel in those proceedings—a public defender had been appointed to represent defendant along with his three codefendants. Defense counsel maintained, however, that the circumstance of the public defender's having represented defendant as well as his codefendants—at the juvenile proceedings and for a short period at the outset of the criminal proceedings—supported the claim of denial of defendant's right to counsel unencumbered by a conflict of interest. In support of the claim of denial of counsel in plea negotiations, defendant stated, among other matters, that during jury deliberations at a time when his appointed counsel, Malek, was absent, counsel for codefendant Golden conveyed to defendant a proposed plea agreement that had been offered by the district attorney, an offer defendant rejected because of his belief he was not guilty.

The defense submitted additional segments of transcripts of the Illinois proceedings, indicating the absence of his appointed attorney, Malek, at various stages of the proceedings. The most serious absence reflected by the partial record occurred at trial, after the case had been submitted to the jury for deliberation. At the time the case was submitted, Malek, apparently

---

[11]Defendant's Illinois murder conviction was affirmed on appeal. (*People* v. *Horton* (1976) 43 Ill.App.3d 150 [1 Ill.Dec. 762, 356 N.E.2d 1044].)

anticipating the possibility that the jury would in fact return a verdict the following day, requested that the court permit counsel for codefendant Golden (Charles Nixon) to stand in for him in the event the jury returned a verdict. Malek explained: "Judge, I ask Mr. Horton if it's okay to excuse my presence tomorrow at the time the jury comes back with their verdict. He indicated he would. So, Mr. Nixon will stand in my stead when the verdict is returned, is that okay? [¶] [The Court:] Yes. [Defendant Horton:] Yes. [¶] [Mr. Nixon:] And, Mr. Malek, do you want me, if there should be an adverse finding as to your client, to poll the jury on your behalf and his behalf. [¶] [Mr. Malek:] Sure, please."

The transcript indicated that the following day, March 28, Malek made a brief appearance in court in the morning and indicated to the court that he would return by 3:30 p.m. Malek did not return, however. The jury deliberated throughout the day without reaching a verdict. At 4:30 p.m., outside the presence of the jury, the trial court, noting Malek's absence, announced its intention to poll the jury regarding whether they were able to reach a verdict, and stated that in the event the jury indicated they were deadlocked the court would instruct them pursuant to the Illinois version of the "dynamite" instruction. When the jurors returned to the courtroom, they indicated, in response to the court's polling of individual jurors, that they would be unable to reach a unanimous verdict even if permitted additional time to deliberate.

Noting that the jury had indicated they would not be able to reach a verdict even with additional time, the court stated that it was "going to declare a mistrial" because the resumption of deliberations "wouldn't serve any purpose." The prosecutor objected. When Nixon also objected to the court declaring a mistrial, the court asked the two attorneys who were present: "Do you want them to deliberate longer? Do you want me to read the instruction?" Nixon clarified that he maintained his objection to the "dynamite charge." The trial court thereupon granted the joint request of the prosecutor and Nixon not to declare a mistrial and instead ordered the jury to return for further deliberations, additionally instructing the jury in accordance with the Illinois version of the "dynamite charge." A few hours later, at 8 p.m., the jury returned a verdict convicting defendant of murder and acquitting codefendant Golden of that charge.[12]

In the instant proceedings the People presented no evidence in opposition to defendant's motion to strike the Illinois prior conviction.

---

[12]As previously noted, defendant's conviction of the Illinois murder was affirmed on appeal by an intermediate appellate court of that state. (*People* v. *Horton, supra*, 356 N.E.2d 1044.) In that appeal, defendant raised the claim of insufficiency of the evidence, as well as ineffective assistance of counsel at trial at the time the jury was deadlocked. In rejecting the latter claim, the Illinois appellate court reasoned: "The record clearly indicates that Mr. Malek delegated full responsibility to Mr. Nixon for the representation of defendant Horton. It is also

At the hearing on the motion to strike, the trial court observed that the partial transcripts submitted as exhibits to the motion to strike did reflect irregularities in the Illinois proceedings that had led to defendant's conviction. The trial court nevertheless indicated its view that it was not required to examine whether any of these irregularities constituted a prejudicial violation of defendant's constitutional rights, undermining the constitutional validity of the Illinois conviction, because these claims either were raised, or could have been raised, on appeal of the Illinois conviction, and an Illinois appellate court apparently had affirmed the conviction on appeal. At the conclusion of the hearing, the trial court denied defendant's motion to strike the prior-murder-conviction special-circumstance allegation.

Defendant contends that the record of the Illinois court proceedings submitted in support of the motion to strike established a prima facie showing as to the constitutional invalidity of the conviction and that, in the absence of a request by the prosecution for an evidentiary hearing, or any evidence in opposition to defendant's prima facie showing, the trial court erred in denying the motion to strike the special circumstance allegation. This error, defendant contends, requires that the prior-murder-conviction special-circumstance finding be vacated, and that the judgment be set aside in its entirety.

Defendant moved to strike the prior-murder-conviction special-circumstance allegation pursuant to *People* v. *Coffey* (1967) 67 Cal.2d 204 [60 Cal.Rptr. 457, 430 P.2d 15] and *People* v. *Sumstine* (1984) 36 Cal.3d 909 [206 Cal.Rptr. 707, 687 P.2d 904]. ▆▆▆ These decisions establish the procedures for raising a collateral attack on a prior conviction by a defendant whose sentence is subject to enhancement because of the prior conviction. (See generally, Leake, *Limits to the Collateral Use of Invalid Prior Convictions to Enhance Punishment for a Subsequent Offense: Extending Burgett v. Texas and United States v. Tucker* (1987) 19 Colum. Hum. Rts. L.Rev. 123.) This type of collateral attack does not serve to vacate or otherwise extinguish a judgment of conviction, or relieve a defendant from the sentence imposed for the underlying conviction, but rather, if successful, prevents its use by the prosecution in a subsequent proceeding to enhance the punishment for a current offense.

apparent from the record that defendant Horton knowingly consented to representation by Mr. Nixon. The conduct of Mr. Nixon indicates that he spoke on behalf of both defendants during the discussion about the jury deadlock. It is speculative to suggest that Mr. Malek would have represented defendant Horton differently than Mr. Nixon at the point of the jury's deadlock. The court considered all the possible courses of action available to it at the deadlock juncture. The facts in the record show that defendant Horton was fully represented. We find no conflict of interest, nor do we find any prejudice resulting to defendant from Mr. Nixon's representation." (*Id.* at pp. 1048-1049.)

*Coffey* and *Sumstine* had their genesis in a group of California cases holding that prior, uncounseled convictions obtained in violation of *Gideon v. Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733] were invalid and could not be used for a sentence enhancement purpose. (*In re Woods* (1966) 64 Cal.2d 3 [48 Cal.Rptr. 689, 409 P.2d 913]; *In re Luce* (1966) 64 Cal.2d 11 [48 Cal.Rptr. 694, 409 P.2d 918]; *In re Tucker* (1966) 64 Cal.2d 15 [48 Cal.Rptr. 697, 409 P.2d 921].) In *Woods*, a defendant who had been convicted of robbery in 1959, and had been found at that time to be an habitual criminal based upon four earlier convictions, sought habeas corpus relief from the final judgment determining his habitual offender status. In the habeas corpus petition, which was filed in 1965, the defendant collaterally attacked each of the prior convictions on the ground that, in each instance in which he had entered a plea of guilty, he neither was advised of his right to, nor was provided with, nor expressly waived, counsel. He argued that under *Gideon v. Wainwright, supra,* 372 U.S. 335 (a case not decided until several years *after* his admission of the priors in the 1959 prosecution for robbery), his prior convictions were invalid, and, as a consequence, their use in the determination of habitual criminality was improper. The court in *Woods* granted the relief requested, observing that, although courts might find it difficult to determine whether defendants tried in the remote past were denied the assistance of counsel, in that " '[r]ecords may be stale, incomplete, or missing, and it may hence be difficult accurately to reconstruct events at prosecutions long ago and far away,' " nevertheless the fundamental nature of the right protected by *Gideon* required the court to entertain the subsequent collateral challenge. (*In re Woods, supra,* 64 Cal.2d at p. 6.) The court in *Woods* explained in this regard: "While we have heretofore limited our examination of foreign convictions used to establish habitual criminality to a consideration of the crime relative to the categories established by [Penal Code] section 644 [citations], and to the determination of whether the rendering court had jurisdiction to try the defendant [citations], we here determine that comity does not require, and reason does not allow, a refusal to examine for constitutional defects foreign judgments used in this state to support an adjudication of habitual criminal status. 'To the extent that any State makes its penal sanctions depend in part on the fact of prior convictions elsewhere, necessarily it must assume the burden of meeting attacks on the constitutionality of such prior convictions.' [Citation.]" (64 Cal.2d at p. 5.)

In *People v. Coffey, supra,* 67 Cal.2d 204, this court held that a defendant need not wait until final judgment, as was done in *Woods,* to challenge the constitutional validity of an uncounseled prior conviction, but could raise the collateral challenge by a pretrial motion to strike the prior conviction at the trial of a subsequent offense. (67 Cal.2d at pp. 214-215.) Citing *Woods* and

other decisions granting habeas corpus relief and setting aside final judgments on similar constitutional grounds, the court in *Coffey* determined that it was "clearly in the interest of efficient judicial administration that attacks upon the constitutional basis of prior convictions be disposed of at the earliest possible opportunity . . . ." (*Id.* at p. 215.) The court held that a clear allegation to the effect that, in the proceedings leading to the prior conviction under attack, the defendant " '*neither was represented by counsel nor waived the right to be so represented,*' " would justify a hearing in the trial court for the purpose of determining whether, in the prior proceedings, the defendant was accorded his right to counsel under the Sixth and Fourteenth Amendments. (67 Cal.2d at p. 215, italics in original.)

Just a few months after this court's decision in *Coffey,* the United States Supreme Court rendered a parallel decision. In *Burgett* v. *Texas* (1967) 389 U.S. 109 [19 L.Ed.2d 319, 88 S.Ct. 258] the high court held that a prior conviction invalid under *Gideon*'s interpretation of the right to counsel could not be employed to invoke a recidivist offender statute that operated to enhance punishment. The court in *Burgett* stressed the adverse effects on the right to counsel that would ensue, were the court to permit the use of uncounseled prior convictions as the predicates for recidivist penalties: an erosion of the principle established in *Gideon,* and a *renewed* injury resulting from the deprivation of the right to counsel. (389 U.S. at p. 115 [19 L.Ed.2d at pp. 324-325].) Subsequently, in *United States* v. *Tucker* (1972) 404 U.S. 443 [30 L.Ed.2d 592, 92 S.Ct. 589] the high court added a further limitation on the use of prior convictions to enhance punishment, by prohibiting the consideration of prior felony convictions invalid under *Gideon* as a factor in sentencing upon a subsequent conviction.[13]

In *People* v. *Sumstine, supra,* 36 Cal.3d 909, 914, this court held that a defendant may attack the validity of a prior conviction alleged as a sentence enhancement by a pretrial motion to strike, authorized by *Coffey,* on the ground of an alleged *Boykin/Tahl* violation (*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]) occurring at the time of his or her plea of guilty to the prior offense. Although noting the language in *Coffey,* appearing to limit the cognizable grounds for such a collateral attack to a *Gideon* violation of the right to counsel, the court in *Sumstine* perceived no principled basis for "allowing a defendant to challenge a prior conviction on the

---

[13]Following *Burgett* v. *Texas, supra,* 389 U.S. 109, and *United States* v. *Tucker, supra,* 404 U.S. 443, the federal circuit courts adopted divergent conclusions as to whether these decisions should be extended to preclude the enhancement of punishment by reliance upon a prior conviction obtained in violation of constitutional rights other than the right to counsel. (See, e.g., *U.S.* v. *Vea-Gonzalez* (9th Cir. 1993) 999 F.2d 1326; *United States* v. *Johnson* (7th Cir. 1980) 612 F.2d 305; *Brown* v. *United States* (9th Cir. 1980) 610 F.2d 672; *Tyler* v. *Swenson* (8th Cir. 1976) 527 F.2d 877.)

ground that it was obtained in violation of his right to counsel but not on the ground that it was obtained in violation of other constitutional rights," and thus held that "[a] *Boykin/Tahl* challenge is equally permissible." (36 Cal.3d at p. 919, fn. omitted.)

The court in *Sumstine* ultimately denied the relief sought, however, concluding the defendant's failure to allege an actual denial of his constitutional rights, and mere reliance upon the silence of the record in this regard, were fatal to his claim. (36 Cal.3d at pp. 922-924.)

In *Curl v. Superior Court* (1990) 51 Cal.3d 1292 [276 Cal.Rptr. 49, 801 P.2d 292] (decided subsequent to the trial in the present case) the court held that a capital defendant may challenge the constitutional validity of a prior murder conviction, alleged as a special circumstance, by a pretrial motion to strike the special circumstance allegation in accordance with the procedures recognized in *Coffey* and *Sumstine*. In *Curl*, the defendant alleged in support of the motion to strike that, at the time he entered a plea of guilty to the prior murder charge, he was not properly advised of his rights pursuant to *Boykin/Tahl*, and was under the influence of drugs that rendered his waiver of rights and entry of plea involuntary and constitutionally defective. (51 Cal.3d at p. 1304.) The court in *Curl* concluded that the evidence introduced by the People at the pretrial hearing effectively rebutted the defendant's claim that his plea was constitutionally defective. (*Id.* at pp. 1304-1305.)

Defendant contends that under *Coffey, Sumstine,* and *Curl,* the trial court in the present case erred in its analysis and disposition of defendant's motion to strike the alleged prior-murder-conviction special circumstance. Defendant contends the trial court's ruling demonstrates that the court did not properly recognize that the prior conviction could be challenged for any constitutional defect—including denial of the right to counsel at a critical stage of the criminal proceedings—that undermined its constitutional validity.

While this case was pending on appeal, the United States Supreme Court rendered a decision in *Custis v. United States* (1994) __ U.S. __ [128 L.Ed.2d 517, 114 S.Ct. 1732] (*Custis*), in which the court examined the circumstances under which a defendant, in the course of the sentencing phase of a federal criminal proceeding, may raise a constitutional challenge to an alleged prior conviction. We requested supplemental briefing from the parties with regard to the relevance, if any, of the *Custis* decision to the present case. Defendant contends *Custis* was based upon the language of the applicable federal statute and simply sets forth a rule of federal criminal procedure; accordingly, defendant maintains, *Custis* has no direct application

to the state law rule of procedure set forth in *Coffey*, *Sumstine*, and *Curl*. The Attorney General, while recognizing that *Custis* involved only a question of federal law, urges us to follow the rationale of that decision and significantly limit the bases upon which a defendant in a California criminal proceeding may challenge the constitutional validity of a prior conviction that is alleged as a special circumstance or for purposes of sentence enhancement. As we shall explain, we conclude that the *Custis* decision does not govern our determination of the issue presented in the case at bar.

In *Custis*, *supra*, __ U.S. __ [128 L.Ed.2d 517, 114 S.Ct. 1732], the United States Supreme Court narrowly restricted the grounds upon which a defendant may collaterally attack the validity of a prior conviction in the course of a federal sentencing proceeding. In that case, Custis was charged with federal drug and firearm offenses. In federal district court, after Custis was convicted of one of the charges as well as a lesser included offense of another charge, the prosecutor sought to enhance his sentence under 18 United States Code section 924(e)(1) by relying upon three prior state felony convictions. Custis challenged the use of two of the prior convictions in the enhancement proceeding on the grounds they were obtained in violation of *Boykin* and of his right to the effective assistance of counsel.

The high court affirmed the rulings of the district court and the United States Court of Appeals for the Fourth Circuit, both of which had denied relief to Custis, the high court holding that the federal statute upon which Custis had based his challenge did not authorize collateral attacks upon prior convictions. Custis argued that, even if the statute did not authorize collateral attacks, the federal Constitution required that he be afforded some means in the sentence enhancement proceeding by which he could challenge the validity of his prior convictions.

The United States Supreme Court disagreed, holding that as a matter of federal law "a defendant has no such right . . . to collaterally attack prior convictions," with the sole exception of convictions obtained in violation of the right to appointed counsel established in *Gideon*. (__ U.S. at p. __ [128 L.Ed.2d at pp. 522-523, 114 S.Ct. at p. 1734].) The court based this limitation in part upon the historical basis (in its jurisprudence pertaining to collateral attacks) for treating the failure to appoint counsel for an indigent defendant as a unique constitutional defect, attributing a jurisdictional significance to the failure to appoint counsel at all. (__ U.S. at pp. __ [128 L.Ed.2d at pp. 526-528, 114 S.Ct. at pp. 1737-1738].) The court further emphasized that such a limitation was compelled by the factor of "[e]ase of administration," because "failure to appoint counsel at all will generally appear from the judgment roll itself, or from an accompanying minute order." (*Id.* at p. __ [128 L.Ed.2d at p. 528, 114 S.Ct. at p. 1738].)

The high court concluded the applicable federal statute did not permit Custis to employ the federal sentencing forum as a means of gaining review of his state convictions, because neither Congress nor the federal Constitution required protraction of the federal sentencing process for such a purpose. The court explicitly recognized, however, that Custis could attack collaterally his state sentences in the states in which these sentences had been rendered or by federal habeas corpus review, and, if successful, then could apply to reopen any federal sentence enhanced by the state convictions. (__ U.S. at p. __ [128 L.Ed.2d at p. 529, 114 S.Ct. at p. 1739].)

Upon a close review of the *Custis* decision and the parties' supplemental briefing, we agree with defendant that *Custis* neither compels nor justifies a modification of existing California law governing a collateral attack, *in a capital proceeding*, upon a prior conviction that the prosecution has alleged as a special circumstance rendering the defendant eligible for the death penalty. *Custis* was not a capital case, and thus the United States Supreme Court did not address the question of the appropriate scope of a collateral challenge in such a setting. Because the collateral challenge in the present case relates solely to the proposed use of a prior conviction in a capital context, we have no occasion in this case to determine whether, or in what respect, the policy considerations set forth by the majority in *Custis* should affect collateral attacks on prior convictions in a noncapital setting.

■ In focusing upon the capital context presented by the case before us, we are mindful of the United States Supreme Court's repeated admonition that " 'the penalty of death is qualitatively different from a sentence of imprisonment, however long,' " and that, as a result, " 'there is a corresponding difference *in the need for reliability in the determination that death is the appropriate punishment in a specific case.*' " (*Gardner* v. *Florida* (1977) 430 U.S. 349, 363 [51 L.Ed.2d 393, 405, 97 S.Ct. 1197] (conc. opn. of White, J., italics in original); see *Lankford* v. *Idaho* (1991) 500 U.S. 110, 125-126 [114 L.Ed.2d 173, 187-188, 111 S.Ct. 1723]; *Johnson* v. *Mississippi* (1988) 486 U.S. 578, 584 [100 L.Ed.2d 575, 583, 108 S.Ct. 1981] (hereafter *Johnson*).)

Because the Constitution places special emphasis upon the need for reliability in the capital context, it is particularly important to assure that a prior conviction that is sought to be used as a basis or justification for the imposition of the death penalty is not tainted by a fundamental constitutional flaw. The United States Supreme Court specifically recognized this principle in its decision in *Johnson, supra,* 486 U.S. 578. In *Johnson,* the defendant was sentenced to death in a Mississippi proceeding based in part upon the aggravating circumstance of having suffered a prior New York felony conviction. After the Mississippi Supreme Court affirmed the death penalty

judgment, the defendant successfully attacked the prior New York conviction in a New York proceeding, the court in the latter proceeding concluding that the conviction must be reversed because the defendant initially had been denied his constitutional right to appeal the conviction and an appeal no longer could be provided, because all records of defendant's trial had been lost. Thereafter, the defendant sought relief in the Mississippi Supreme Court, asserting that the constitutional invalidity of the prior New York conviction (upon which the Mississippi death judgment had been based in part) warranted setting aside the death judgment. The Mississippi court denied relief. The United States Supreme Court granted certiorari and ultimately reversed, holding that a death sentence predicated in part upon a prior conviction that has been set aside on constitutional grounds cannot be sustained. (486 U.S. at pp. 585-586 [100 L.Ed.2d at pp. 584-585].) The court reasoned that to allow a death sentence to stand although based in part upon a reversed conviction would be contrary to the court's previous recognition of "a special ' "need for reliability in the determination that death is the appropriate punishment" ' in any capital case." (*Id.* at p. 584 [100 L.Ed.2d at p. 584].) Accordingly, the court in *Johnson* recognized that a prior conviction that is invalidated on constitutional grounds (including an invalidation based upon the violation of a constitutional right other than the right to counsel established in *Gideon*) does not constitute reliable evidence that properly may support a sentence of death.

As the *Johnson* decision, *supra*, 486 U.S. 578, demonstrates, the special need for reliability in the death penalty context is undermined whenever a prior conviction (upon which a death penalty judgment is based) is tainted by a fatal fundamental constitutional defect. *Johnson* also demonstrates that the constitutional problem is not confined to instances in which the prior conviction is invalid because of *Gideon* error. As we have seen, in *Johnson* itself the prior conviction had been invalidated by the New York court for another type of fundamental constitutional violation, namely, the denial of the right to appeal. Accordingly, we conclude that, in the context of a capital case, a collateral challenge to a prior conviction that has been alleged as a special circumstance may not properly be confined to a claim of *Gideon* error, but may be based upon at least some other types of *fundamental* constitutional flaws.

In the present case, the nature of at least one of the alleged constitutional violations that occurred at defendant's Illinois trial—denial of the assistance of counsel at a critical stage of the trial—constitutes a serious infringement of a defendant's fundamental right to counsel under the Sixth Amendment. (*People* v. *Hogan* (1982) 31 Cal.3d 815, 848-850 [183 Cal.Rptr. 817, 647 P.2d 93]). In *Hogan*, we recognized that the denial of the right to representation of counsel at a critical stage of trial, affecting a defendant's substantial

rights, gives rise to a presumption of prejudice, both because of the funda-mental nature of the right involved (the right to the assistance of counsel) and its relation to a fair trial. (*Ibid.*) A conviction flawed by a constitutional violation of this magnitude is antithetical to the heightened need for reliabil-ity in the determination that death is the appropriate sentence. For these reasons, we conclude that an alleged constitutional violation of the right to counsel at a critical stage of trial falls within the bounds of the permissible grounds that, under *Coffey*, will support a motion to strike a prior-murder-conviction special circumstance in a capital case.

 As our decision in *Curl* v. *Superior Court, supra*, 51 Cal.3d 1292, makes clear, when a defendant challenges the validity of a prior conviction, he or she bears the burden of establishing its constitutional invalidity. To meet this burden, it is not enough for a defendant simply to make some showing that a constitutional error occurred in the prior criminal proceed-ings. A prior conviction carries a " '*strong presumption of constitutional regularity*,' " and the defendant must establish a violation of his or her rights that " 'so departed from constitutional requirements' " as to justify striking the prior conviction. (*Id.* at p. 1304, italics in original.)

 Although the circumstances may be rare that will support a prima facie case of a complete denial of representation at a critical trial stage, the record establishes that defendant met his burden in the present case. The materials presented in support of his motion to strike demonstrated that he was denied the assistance of counsel when the jury announced it was deadlocked and the trial court went forward with the proceeding, in the particular manner recited below, despite the absence of defendant's own attorney. It is clear from the record that counsel for codefendant Golden agreed expressly to stand in for Malek (defendant's own attorney) *solely* for the limited purpose of receiving a jury verdict and polling the jurors. Neither defendant nor Malek consented to have Nixon represent defendant in the event of a jury deadlock. Nor was defendant advised of, nor did he waive, a conflict between his interests and those of Nixon's client, Golden.

The record also establishes that this stage of the proceedings was a critical one from defendant's standpoint—a time at which crucial decisions affecting his defense were to be made, and where his counsel could have taken steps that would have protected and furthered defendant's substantial rights. (See *United States* v. *Wade* (1967) 388 U.S. 218, 224-226 [18 L.Ed.2d 1149, 1155-1157, 87 S.Ct. 1926]; *People* v. *Dagnino* (1978) 80 Cal.App.3d 981, 989-990 [146 Cal.Rptr. 129].)

The transcript reflects that the trial court was prepared to declare a mistrial and that a principal reason it did not take this action was because Nixon—the

only defense counsel present—urged the court to allow the jury to continue its deliberations. With regard to the decision whether to declare a mistrial, however, the interests of defendant and those of Nixon's own client were in considerable conflict. The victim had been killed by a shotgun blast fired by defendant or by codefendant Golden in a gang-related dispute. There was evidence presented during the trial tending to establish that only one of the two codefendants had fired a fatal shot, and the evidence implicating defendant appeared stronger than the evidence implicating Golden. Malek had not called any witnesses on behalf of defendant, whereas Nixon had introduced evidence providing his client with an alibi defense. (The disparity in the evidence of guilt—indicating a conflict of interest between the two codefendants—was borne out by the jury verdict, following the resumption of deliberations, convicting defendant of murder and acquitting Golden.) Under these circumstances, it appears the declaration of a mistrial would have been substantially more favorable to defendant than to codefendant Golden, and the record clearly indicates the trial court was prepared to declare a mistrial. The absence of defendant's own counsel prevented defendant from pressing for a mistrial, or—in the event Nixon continued to seek renewed jury deliberations on behalf of Golden—from moving to have his case severed from Golden's case, and a mistrial declared with respect to defendant. Thus, defendant was denied representation at a stage at which the exercise of his counsel's judgment and skill could have resulted in an outcome dramatically more favorable to defendant than a conviction of murder.

Although denial of counsel at a critical stage of a trial is not prejudicial as a matter of law, " 'prejudice will be presumed if the denial may have affected the substantial rights of the accused. Only the most compelling showing to the contrary will overcome the presumption. The court must be able to declare a belief the denial of counsel was harmless beyond a reasonable doubt [under *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].]' " (*People* v. *Jennings* (1991) 53 Cal.3d 334, 384 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People* v. *Hogan*, *supra*, 31 Cal.3d 815, 849 ["[I]f the denial of the right to counsel during jury deliberations may have affected substantial rights of a defendant, prejudice is presumed and '[o]nly the most compelling showing to the contrary will overcome the presumption.' "].)

Under the foregoing rules, Attorney Malek's absence at a critical stage of the proceedings gave rise to a presumption of prejudice, and the People failed to make any showing that would rebut that presumption. Accordingly, we cannot find the error harmless beyond a reasonable doubt.

The People further contend, however, that even if the nature of the constitutional defect in the prior conviction was of a type that a defendant

could otherwise raise by a collateral attack in a capital case, the trial court's denial of defendant's motion properly can be upheld either on the ground that defendant "could and should" have raised the issue on direct appeal of the prior conviction, or on the ground that the claim was, in fact, raised and rejected in the Illinois appeal. (See *In re Waltreus* (1965) 62 Cal.2d 218, 225 [42 Cal.Rptr. 9, 397 P.2d 1001]; *In re Dixon* (1953) 41 Cal.2d 756 [264 P.2d 513].) We disagree. Even in the noncapital context, past California decisions have held that, because a motion to strike a prior conviction pursuant to *Coffey* does not serve to vacate or extinguish the conviction or to require a retrial of the charges leading to the conviction, the established "procedural bars" that would apply in a habeas corpus proceeding seeking to vacate the prior conviction do not necessarily apply to a *Coffey* motion. (*People* v. *Sumstine, supra*, 36 Cal.3d, at pp. 920-921.) Further, although it may be that in a noncapital case a defendant generally would not be permitted to challenge a prior conviction by a *Coffey* motion on the basis of a constitutional claim that had been explicitly raised and rejected on direct appeal—an issue we need not decide—we do not believe it would be appropriate to apply such a rule in the context of capital proceedings, particularly where a serious deficiency in the prior appellate review is apparent from the appellate opinion itself.

As we have explained, the unique nature of the death penalty imposes a special need for reliability in the determination of the applicability and appropriateness of this ultimate sanction. In the capital context, a defendant almost invariably will face much graver consequences from the use of the prior conviction, as a predicate for a special circumstance finding, than he or she faced in the earlier criminal proceeding; it is because of those grave consequences, of course, that a defendant has been accorded special procedural protections and assistance in a capital case. In many instances, it may be unfair—and inconsistent with the special need for reliability—to deprive a defendant of the right to demonstrate the invalidity of the prior conviction in the subsequent capital prosecution simply because in the prior proceeding, when much less may have been at stake and the defendant may not have been accorded the same procedural protections, defendant did not prevail on the issue. Thus, notwithstanding the proper deference that normally should be accorded the judgments of sister states, where an error in an appellate court's prior review of an alleged constitutional violation appears on the face of the judgment itself, and the claimed violation is tantamount to a complete denial of representation at a critical trial stage, the prior judgment should not bar a defendant from raising that claim in a California capital proceeding.

The circumstances of the instant case may illustrate this point. Although the record does not reveal the content or quality of the briefing that was

presented to the Illinois intermediate appellate court on behalf of defendant, that court's treatment of the incident in question—suggesting that the record clearly indicated that Malek had "delegated full responsibility" for the representation of defendant to Nixon (see, *ante*, fn. 12)—appears quite inadequate in light of the trial transcript that is before us. Indeed, the legal and factual conclusions of the Illinois court in this regard (see fn. 12, *ante*) are immediately refuted by a brief review of the transcript of the proceedings. Furthermore, although the Illinois appellate court rejected defendant's claim of constitutional error with regard to defense counsel's absence, the appellate court's overall disposition of the case would not necessarily have been viewed as unsatisfactory to the defendant, because the appellate court significantly reduced defendant's sentence.

Thus, we believe that the increased need for reliability in the death determination process warrants a rule that permits a defendant, at least in the context of capital proceedings, to challenge the constitutional validity of a prior conviction (alleged as the basis of a special circumstance) on the fundamental ground raised in the present case, even where the issue has been decided adversely to the defendant in the direct appeal of the prior conviction.

Finally, we observe that in capital cases, considerations of judicial economy—one of the underpinnings of *Coffey*—strongly support a procedure that permits a defendant to raise, at a pretrial stage, this type of collateral challenge to a prior murder conviction alleged as the basis for a special circumstance. A death sentence premised upon a prior murder conviction that is, in fact, tainted by a fundamental constitutional flaw inevitably will give rise to one or more exhaustive habeas corpus petitions in this court and possibly in federal tribunals, probably requiring, ultimately, that the death penalty judgment be set aside under the principles articulated in *Johnson* v. *Mississippi*, *supra*, 486 U.S. 578. If a constitutionally defective prior murder conviction alleged as the basis of a special circumstance is stricken prior to trial, the defense, the People, and the judicial system all may be spared the time, expense, and effort of prosecuting a capital case through trial, automatic appeal, and habeas corpus proceedings, only to have the death penalty judgment ultimately set aside. (See also *People* v. *Fosselman* (1983) 33 Cal.3d 572, 582 [189 Cal.Rptr. 855, 659 P.2d 1144] ["[I]n appropriate circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial."].)

For all of the foregoing reasons, we conclude the trial court in the present case erred in denying defendant's motion to strike the prior-murder-conviction special-circumstance allegation on the ground of the constitutional invalidity of the underlying prior murder conviction. Under the circumstances where the prosecution was provided an opportunity to present

evidence to rebut defendant's showing in support of the motion to strike, but failed to do so, we need not, and therefore do not, remand for a new hearing on the motion. Accordingly, we determine the prior-murder-conviction special-circumstance finding must be set aside.

 We further conclude, notwithstanding the validity of the separate robbery-murder special circumstance, that our determination to vacate the prior-murder-conviction special circumstance requires that we also set aside the death penalty judgment. At the penalty phase, the prosecution presented no new evidence in aggravation, relying entirely, in aggravation, upon defendant's prior murder conviction (arguing to the jury that "we wouldn't be here today" but for the prior murder conviction), as well as the circumstances of the current capital offense. In this context, we conclude there exists a reasonable possibility the jury would have returned a verdict of life imprisonment without possibility of parole, instead of death, absent the prior-murder-conviction special-circumstance finding. (See *People* v. *Mickey, supra*, 54 Cal.3d 612, 703; *People* v. *Brown* (1988) 46 Cal.3d 432, 446-447 [250 Cal.Rptr. 604, 758 P.2d 1135].)

We reject, however, defendant's contention that in the event the prior-murder-conviction special-circumstance finding is set aside, the guilt phase verdict also must be set aside. Defendant argues that if the prior murder conviction had been invalidated at the *outset* of the guilt phase of the trial, he would have had an opportunity to present a defense more effective than that which he was able to present at the proceedings below. The record does not indicate, however, that defendant sought a hearing on his motion to strike the prior-murder-conviction special-circumstance allegation at any time prior to shortly before the completion of the defense case at the guilt phase. In their written notice of motion, defense counsel designated March 22, 1985, as the date for the hearing on the motion to strike, although the hearing actually went forward on March 21, the date the defense commenced its case (after the prosecution had rested on March 19). The defense concluded its case on March 25. Under these circumstances, defendant waived any claim related to the setting of the hearing on his motion to strike the prior-murder-conviction special circumstance after commencement of the guilt phase.

In conclusion, the trial court's error in denying defendant's motion to strike the prior-murder-conviction special circumstance allegation requires that we set aside that special circumstance finding, as well as the judgment imposing the death penalty, but does not affect any other aspect of the judgment. On remand, the People may seek the imposition of the death penalty based upon the special-circumstance finding that the murder was committed in the course of a robbery, and, at a penalty retrial, present in aggravation evidence of the circumstances of the prior murder of which

defendant was convicted in Illinois, to the extent such evidence is otherwise admissible under generally applicable evidentiary rules.

VI. *Appellate Delay*

■ Defendant contends the fact that certification and preparation of the record spanned eight years (the certified record was filed on July 16, 1993) violated his right to due process of law under the federal and state Constitutions, among other rights. In some circumstances, excessive delays in the appellate process may give rise to a denial of due process. (*United States* v. *Loud Hawk* (1986) 474 U.S. 302, 313-314 [88 L.Ed.2d 640, 652-653, 106 S.Ct. 648]; *Coe* v. *Thurman* (9th Cir. 1990) 922 F.2d 528, 530.) Defendant fails, however, to demonstrate any actual prejudice as a result of the delay, such as an impairment of grounds on appeal, but simply alleges the possibility or potential for harm. Thus, his constitutional claim must fail. (*Coe* v. *Thurman, supra*, 922 F.2d at p. 530; see *United States* v. *Loud Hawk, supra*, 474 U.S. at p. 315 [88 L.Ed.2d at p. 654].)

DISPOSITION

The prior-murder-conviction special-circumstance finding and the sentence of death are set aside, and the judgment is otherwise affirmed.

Kennard, J., Arabian, J., and Werdegar, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—I concur that the guilt judgment must be affirmed. However, I respectfully dissent from the reversal of the special circumstance and penalty judgments.

I dispute, as a matter of law, the majority's conclusion that defendant may challenge the 1971 Illinois murder conviction proved against him as a special circumstance (Pen. Code, § 190.2, subd. (a)(2)) on grounds that his appointed counsel's voluntary absence during one trial day in the long-final Illinois case, and his consequent temporary representation by his codefendant's attorney, rendered the Illinois conviction constitutionally invalid. Our cases have recognized certain fundamental defects which may render a prior conviction invalid as a basis for enhancing the sentence in a later case. However, no prior decision of this court has imposed upon California trial or appellate courts the burdensome duty to evaluate detailed claims of mere "trial error" in a prior unrelated criminal proceeding.

Recent United States Supreme Court authority makes clear that the federal Constitution does not require examination of the validity of a prior conviction beyond a claim that counsel was completely denied. Contrary to the majority's suggestion, there is no indication from the high court that a different rule applies in capital cases.

Moreover, the error the majority identify as a basis for striking defendant's 1971 Illinois conviction is a particularly unwarranted ground for such relief, since the same challenge was rejected on defendant's direct appeal from the Illinois judgment. I find no basis for allowing an accused to attack his prior conviction upon grounds previously considered and rejected on direct or collateral appellate review of the prior case. The majority's contrary view violates compelling principles of finality and comity, and it may also place California trial courts in the unseemly position of second-guessing final *appellate* decisions from California or elsewhere.

Accordingly, I reject the analysis by which the majority strike defendant's prior murder conviction as a special circumstance. My reasons follow in greater detail.

In *Gideon* v. *Wainright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733] (*Gideon*), the United States Supreme Court held that the state court conviction of an indigent is constitutionally invalid, whenever and wherever obtained, if counsel was neither appointed for the accused nor waived by him. This court soon acknowledged that if a conviction was invalid under *Gideon*, it could not be used as a statutory sentencing factor in a later case. (*In re Woods* (1966) 64 Cal.2d 3, 5-6 [48 Cal.Rptr. 689, 409 P.2d 913]; see also *People* v. *Merriam* (1967) 66 Cal.2d 390, 397 [58 Cal.Rptr. 1, 426 P.2d 161] ["One seeking to challenge prior convictions charged against him may do so only through a clear allegation . . . that . . . he neither was represented by counsel nor waived the right to be so represented."], italics omitted.) Such use, we concluded, could be challenged either by a habeas corpus petition after sentencing in the later proceeding (*In re Woods, supra*, 64 Cal.2d at p. 5), or during the proceeding itself by a motion to strike the prior conviction (*People* v. *Coffey* (1967) 67 Cal.2d 204, 215 [60 Cal.Rptr. 457, 430 P.2d 15]).

Eventually, the United States Supreme Court itself recognized that a conviction rendered in violation of *Gideon* may not constitutionally influence the sentence imposed for a later offense. (*United States* v. *Tucker* (1972) 404 U.S. 443, 447-449 [30 L.Ed.2d 592, 596-597, 92 S.Ct. 589]; *Burgett* v. *Texas* (1967) 389 U.S. 109 [19 L.Ed.2d 319, 88 S.Ct. 258].) Any other result, the court indicated, would "erode" the principle of *Gideon* that every conviction obtained without affording an indigent accused any assistance of counsel is "void." (*Burgett* v. *Texas, supra*, 389 U.S. at pp. 115-116 [19 L.Ed.2d 324-326]; see also *United States* v. *Tucker, supra*, 404 U.S. at p. 449 [30 L.Ed.2d at pp. 597-598].)

In *People* v. *Sumstine* (1984) 36 Cal.3d 909 [206 Cal.Rptr. 707, 687 P.2d 904] we extended California's motion-to-strike procedure, as established in

*People* v. *Coffey*, *supra*, 67 Cal.2d 204, to claims that a prior conviction was based on a guilty plea entered in ignorance of the constitutional trial rights thereby waived. (See *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].) And, in *Curl* v. *Superior Court* (1990) 51 Cal.3d 1292 [276 Cal.Rptr. 49, 801 P.2d 292], we held that a prior murder conviction, alleged as a special circumstance in a capital case, could be challenged on *Boykin/Tahl* grounds in the capital proceeding. Despite dictum in *Sumstine* and other decisions to the effect that a prior conviction may be challenged on "any" constitutional grounds, we have never explicitly applied the principles of *Coffey* and *Sumstine* except to claims of complete denial of counsel and involuntary plea.[1]

The difficulties of allowing more extensive challenges are obvious. The record and evidence necessary to determine whether a prior case involved a complete denial of counsel or an involuntary plea are often not unduly complex. But the judicial burden of examining a recidivist's prior record for less fundamental defects is great. The danger arises that each charged prior would thus become the basis for its own mini-appeal, in which every arguable misstep in the prior case could be asserted as "constitutional" error.

Carried to its logical end, such a rule would require, as here, the full examination of trial records in cases from any state or federal jurisdiction, long past and long final for all other purposes. Claims of "constitutionally" ineffective assistance might further require the taking of new evidence at far-flung locations, decades after witnesses have died and memories faded. The current trial would have to be postponed while the accused was given the chance to assemble evidence against his prior convictions. The delays and difficulties inherent in such a system would seriously undermine the orderly administration of justice and would jeopardize the numerous provisions which enhance punishment for recidivism.

Any inference that such burdensome and time-consuming procedures are required by the federal Constitution was recently repudiated by the United

---

[1]In *People* v. *Wharton* (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290], we rejected, on the merits, defendant's claim that his prior murder conviction, alleged as a special circumstance in a capital case, was invalid because the trial court in the prior case had failed, sua sponte, to order a hearing on his competency to plead guilty, or to allow withdrawal of his plea on grounds of incompetency. (*Id.* at pp. 583-585.) Like *Boykin/Tahl* challenges, such a claim goes to the voluntariness, in the constitutional sense, of a waiver of trial. In *People* v. *Coleman* (1969) 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248], after reversing both guilt and penalty judgments in a capital case on other grounds, we briefly noted that on retrial, defendant could employ the procedures of *People* v. *Coffey*, *supra*, 67 Cal.2d 204, to challenge use of his prior Virginia burglary conviction on grounds that he received ineffective assistance in the Virginia case. The nature of the ineffective-assistance claims, however, was not specified. (*People* v. *Coleman*, *supra*, 71 Cal.2d at p. 1169.)

States Supreme Court. In *Custis* v. *United States* (1994) __ U.S. __ [128 L.Ed.2d 517, 114 S.Ct. 1732], one convicted of a federal firearms offense faced a maximum sentence of life without parole on the basis of charges that he had suffered three previous state felony convictions. He claimed the prior convictions were constitutionally invalid because they stemmed from ineffective assistance of counsel and involuntary pleas. Both the district court and the court of appeals ruled that these challenges were not cognizable in a federal sentencing proceeding. By a vote of six to three, the Supreme Court affirmed.

At length, the *Custis* majority dismissed defendant Custis's contention that the federal recidivism statute contemplates collateral attacks on the validity of prior convictions used for sentencing. The majority then rejected the notion that any and all such challenges must be allowed as a matter of constitutional right. The majority acknowledged the decisions in *Burgett* v. *Texas, supra*, 389 U.S. 109, and *United States* v. *Tucker, supra*, 404 U.S. 443, holding that prior convictions are subject to collateral attack for *Gideon* violations. But the majority declined defendant Custis's invitation to extend the grounds for such challenges.

The *Custis* majority said, "We think that since the decision in *Johnson* v. *Zerbst* [(1938) 304 U.S. 458 (82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357)] [recognizing right to assistance of appointed counsel in federal prosecutions] more than half a century ago, and running through our decisions in *Burgett* and *Tucker*, there has been a theme that *failure to appoint counsel for an indigent defendant* was a unique constitutional defect. Custis attacks his previous convictions claiming the denial of the effective assistance of counsel, that his guilty plea was not knowing and intelligent, and that he had not been adequately advised of his rights in opting for a 'stipulated facts' trial. None of these alleged constitutional violations rises to the level of a jurisdictional defect resulting from the *failure to appoint counsel at all*. [Citation.]

"Ease of administration also supports the distinction. As revealed in a number of the cases cited in this opinion, failure to appoint counsel at all will generally appear from the judgment roll itself, or from an accompanying minute order. But determination of claims of ineffective assistance of counsel, and failure to assure that a guilty plea was voluntary, would require sentencing courts to rummage through frequently nonexistent or difficult to obtain state court transcripts or records that may date from another era, and may come from any one of the 50 States.

"The interest in promoting the finality of judgments provides additional support for our constitutional conclusion. As we have explained, '[i]nroads on the concept of finality tend to undermine confidence in the integrity of

our procedures' and inevitably delay and impair the orderly administration of justice. [Citations.] We . . . noted in *Parke* v. *Raley,* 506 U.S. 20, 113 S.Ct. 517, . . . (1992), that principles of finality associated with habeas corpus actions apply with at least equal force when a defendant seeks to attack a previous conviction used for sentencing. By challenging the previous conviction, the defendant is asking a district court 'to deprive [the] [state court judgment] of [its] normal force and effect in a proceeding that ha[s] an independent purpose other than to overturn the prior judgmen[t].' [Citation.]" (*Custis* v. *United States, supra,* __ U.S. at pp. __-__ [128 L.Ed.2d at pp. 528-529, 114 S.Ct. at pp. 1738-1739], italics added, last paragraph text brackets in *Custis.*)

Though *Custis* dealt with federal sentencing and the relation of federal to state courts, its constitutional analysis is clear and persuasive in all contexts.[2] Apparently chastened by the force of *Custis*'s reasoning, the majority here wisely avoid adopting a blanket rule that all "constitutional" challenges against prior convictions are permissible in all criminal cases under California law.

Nonetheless, the majority suggest that when a prior conviction is charged for purposes of death eligibility in a capital case, an attack upon the prior conviction's validity should not be limited to *Gideon* error, but may include certain other "fundamental" constitutional defects, such as defendant's claim that he was deprived of counsel at a "critical stage" of his 1971 murder trial. The majority submit that because of the heightened reliability concerns in a capital trial, a capital defendant must be allowed to raise any fundamental constitutional error in a prior conviction alleged against him as a basis for the death penalty. But the United States Supreme Court decision on which the majority rely for this principle is inapposite.

In *Johnson* v. *Mississippi* (1988) 486 U.S. 578 [100 L.Ed.2d 575, 108 S.Ct. 1981] the defendant was sentenced to death for a 1981 murder. The Mississippi death judgment was predicated in part on evidence that he had sustained a 1963 New York felony conviction for assault. During the trial

---

[2]*After* holding unequivocally that there is no constitutional right to challenge the validity of a prior conviction in a federal sentencing proceeding, except with respect to *Gideon* claims, the *Custis* majority remarked that because the defendant in that case was still "in custody" on his state convictions at the time of his federal sentence, he retained the right to attack those convictions in state habeas corpus proceedings. If successful in vacating the state-court judgments, the *Custis* majority surmised, the defendant might then be permitted to reopen the federal sentencing proceeding on the premise that his federal sentence had been influenced by nonexistent priors. (__ U.S. at p. __ [128 L.Ed.2d at pp. 528-529, 114 S.Ct. at p. 1739].) Contrary to implications in the instant majority opinion, nothing in these comments suggests that the *Custis* majority relied on the availability of state remedies in that case as a basis for its constitutional decision.

and direct appeal in the Mississippi case, defendant Johnson never attempted to challenge the validity of the New York conviction. The Mississippi Supreme Court affirmed the death judgment.

Though Johnson did not attack his New York conviction in the original Mississippi proceedings, he had previously made several attempts in New York, without assistance of counsel, to appeal that conviction on grounds that his confession was coerced. All such efforts had been rejected as untimely. After the Mississippi death judgment was rendered, however, Johnson's attorneys commenced a new attack in New York's courts against the 1963 conviction. Johnson's new motion asserted that he had never been informed of his right to appeal in the 1963 case. Ultimately, his claim prevailed, and his 1963 conviction was reversed by the New York Court of Appeals.

Johnson then moved in the Mississippi Supreme Court for postconviction relief from the death judgment on grounds that the now invalid New York conviction could not serve as an aggravating circumstance. The motion was denied.

On certiorari, the United States Supreme Court noted that the issue was whether the Eighth Amendment's reliability requirements for capital cases would be violated by "allowing [Johnson's] death sentence to stand although based in part on a *reversed* conviction." (*Johnson* v. *Mississippi*, *supra*, 486 U.S. 578, 585 [100 L.Ed.2d 578, 584], italics added.) As the high court explained, the Mississippi prosecutor had used the 1963 New York conviction as the sole proof that Johnson committed the criminal conduct underlying the conviction. "Since that conviction has been *reversed*," said the court, "unless and until [Johnson] should be retried, he must be *presumed innocent* of that charge. Indeed, even without such a presumption, the *reversal* of the conviction deprives the prosecutor's sole piece of documentary evidence of any relevance to Mississippi's sentencing decision." (*Ibid.*, italics added.)

Thus, *Johnson* establishes only the unremarkable principle that a prior conviction *which no longer exists for whatever reason* cannot constitute evidence of criminality in support of a death judgment. Nothing in *Johnson*'s analysis supposes that a conviction which *remains in full force and effect* nonetheless becomes irrelevant in a later capital case if then found to be tainted with constitutional error. And *Johnson* nowhere suggests that a state court in which capital proceedings are pending must entertain the defendant's motion to preclude use of a prior conviction, otherwise fully extant, on such grounds.

Indeed, the holding of *Johnson* is entirely consistent with the discussion of state remedies more recently set forth in *Custis* v. *United States*, *supra*, __

U.S. \_\_, \_\_-\_\_ [128 L.Ed.2d 591, 528-529, 114 S.Ct. 1732, 1739]. Both cases simply recognize that if the accused succeeds in overturning a prior conviction *for all purposes*, the extinct conviction, as such, cannot influence the sentencing decision in a later case.

The limited nature of *Johnson*'s holding is further indicated by the court's response to the state's separate contention that no federal question was presented in that case. The state asserted that by failing to challenge the validity of his 1963 conviction during the trial and direct appeal in the capital case, defendant Johnson had failed to make a timely claim under Mississippi law, and this was an "independent state ground" for Mississippi's refusal to grant postconviction relief.

In rejecting this procedural argument, *Johnson* merely invoked the familiar rule that federal jurisdiction will not be defeated by a state procedural bar unless the state itself has applied the bar "consistently or regularly." (*Johnson* v. *Mississippi*, *supra*, 486 U.S. at p. 587 [100 L.Ed.2d at pp. 585-586].) The Mississippi Supreme Court, *Johnson* noted, had ruled in both capital and noncapital cases that a sentencing proceeding was *never* the appropriate forum to litigate the validity of a prior conviction, and that the prior must be attacked in the jurisdiction which rendered it. Hence, *Johnson* reasoned, Mississippi courts had not "consistently or regularly" applied the bar of timeliness which the state now sought to assert. (*Id.* at pp. 587-589 [100 L.Ed.2d at pp. 585-587].)

By proceeding in this narrow fashion, *Johnson* avoided expressing any opinion about whether the views of the Mississippi Supreme Court were constitutionally correct. Hence, *Johnson* is no authority for the instant majority's view that capital defendants have a constitutional right, above and beyond that of noncapital defendants, to challenge the constitutional validity of prior convictions which have not otherwise been extinguished.

I would find no such right applicable to this case. Counsel was appointed for defendant in his 1971 Illinois murder case, and he exercised his right to a trial on the issue of his guilt. He presumably received the assistance of counsel with respect to all motions, evidence, instructions, and argument. The Illinois jury then found him guilty of murder beyond a reasonable doubt. The conviction remains in existence to this day, having never been reversed, vacated, or expunged. Because final, it carries a high presumption of accuracy and validity. Under these circumstances, I cannot conclude that the Eighth Amendment nonetheless obliges California courts, at this late date, to examine the trial record of the prior final conviction for constitutional error, "fundamental" or otherwise, before allowing its use as a special circumstance.

There is a further reason why the flaw the majority find in the 1971 conviction should not preclude use of that judgment in this proceeding. As the majority concede, the same claim of error was raised and rejected on direct appeal in the 1971 case. (*People* v. *Horton* (1976) 43 Ill.App.3d 150 [1 Ill.Dec. 762, 356 N.E.2d 1044].) The majority's acceptance of defendant's claim is nothing less than a direct refusal to effectuate the long-final appellate determination of a sister jurisdiction.

*In re Harris* (1993) 5 Cal.4th 813 [21 Cal.Rptr.2d 373, 855 P.2d 391] recently affirmed that a petition for habeas corpus may not raise claims already considered and rejected on appeal unless they (1) are based on an intervening new rule of law (*id.* at pp. 841-841), (2) legitimately assert "jurisdictional" defects in the judgment under attack (*id.* at pp. 836-841), or (3) allege constitutional error, "both clear and fundamental, [which] strikes at the heart of the trial process" (*id.* at p. 834, citing *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 309 [113 L.Ed.2d 302, 331, 111 S.Ct. 1246] [only errors amounting to a structural defect in the trial mechanism deserve automatic reversal]). The general rule against reconsideration of appellate claims stems from the presumption that an appeal, where afforded, is usually an adequate remedy and that judgments must eventually become final. (*In re Harris*, *supra*, 5 Cal.4th 813, 824-834.) Nothing in *Harris* indicates that more lenient terms should apply to habeas corpus petitions attacking judgments of death.

The majority do not suggest that the flaw they find in defendant's 1971 conviction would be cognizable on habeas corpus under any of the *Harris* exceptions. Specifically, the majority make no claim, nor could they, that the temporary absence of defendant's counsel from the 1971 trial, during which the codefendant's attorney undertook to represent both of the accused in resolving a jury deadlock, rendered the 1971 proceeding so pervasively unfair as to constitute a "structural [defect] in the . . . trial mechanism" (*Arizona* v. *Fulminante*, *supra*, 499 U.S. 279, 309 [113 L.Ed.2d 302, 331]) or a blow "at the heart of the trial process" (*In re Harris*, *supra*, 5 Cal.4th 813, 834).

Instead, the majority invoke the principle that procedural limitations on habeas corpus do not necessarily govern motions to preclude use of a prior conviction in a later sentencing proceeding. Moreover, the majority suggest, a capital defendant in particular must be allowed to challenge a prior conviction, even on grounds previously rejected, when "an error in an appellate court's prior review of an alleged constitutional violation appears on the face of the judgment itself, and the claimed violation is tantamount to a complete denial of representation at a critical trial stage." (Maj. opn., *ante*, p. 1138.)

The majority's first premise is drawn from *People* v. *Sumstine, supra,* 36 Cal.3d 909. There we rejected the argument that a motion to strike a prior conviction, where otherwise appropriate, should be limited by considerations of *timeliness* which apply to petitions for habeas corpus. We noted that the purpose of a motion to strike is not to vacate the prior conviction entirely, but merely to challenge the "present effect" of the conviction. "As the state is the party proposing to assert the effect of the prior conviction at the current trial," we reasoned, "the state should also be prepared to face challenges to it." (*Id.* at p. 921, fn. omitted.)

Whatever the force of that rationale on the issue of timeliness, it hardly explains why a motion to strike may relitigate claims already specifically rejected in the prior case. No reason appears why the state, when seeking to use the prior conviction in a later trial, must face challenges to that conviction which have already been considered and dismissed. On the contrary, as in habeas corpus, the fact that the defendant's claim was raised and expressly rejected on appeal should constitute a particularly strong bar to subsequent litigation.

Moreover, intervening law casts grave doubt on *Sumstine*'s general proposition that challenges to the validity of prior convictions deserve more lenient procedural treatment than habeas corpus petitions. As noted above, the majority in *Custis* v. *United States, supra,* __ U.S. __ [128 L.Ed.2d 517, 114 S.Ct. 1732] has made clear that "principles of finality associated with habeas corpus actions apply with at least equal force when a defendant seeks to attack a previous conviction used for sentencing. By challenging the previous conviction, the defendant is asking a district court 'to deprive [the] [state court judgment] of [its] normal force and effect in a proceeding that ha[s] an independent purpose other than to overturn the prior judgmen[t].' [Citation.]" (*Id.* at p. __ [128 L.Ed.2d at p. 529, 114 S.Ct. at p. 1739], brackets in *Custis.*) Similar considerations apply when California courts are asked, in unrelated proceedings, to deny such effect to final appellate judgments rendered here or elsewhere.

The logical weight of such conclusions again forces the majority into retreat. As a "fallback," they suggest that the second-guessing of a prior appellate judgment may nonetheless be appropriate when the challenge is raised in a capital case, the nature of the claim is "tantamount to a complete denial of representation at a critical trial stage," and the prior appellate resolution of the issue is wrong "on the face of the judgment." (Maj. opn., *ante,* p. 1138.)

Even were I to accept these dire characterizations of the 1971 conviction, which I do not, I would find the majority's position unpersuasive. The

majority cite no authority for their narrow rule, and it seems but an ipse dixit conveniently designed to allow consideration of the claim on which the majority base their reversal.

On its own merits, moreover, the majority's rule is not convincing. As previously noted, nothing in the special nature of capital cases requires us to adopt procedures that would be unworkable and mischievous in other contexts. With the possible exception of *Gideon* claims, the notion that final appellate judgments should ever be reexamined on their merits in later sentencing matters violates the considerations set forth in *Custis* v. *United States, supra,* ___ U.S. ___ [128 L.Ed.2d 517, 114 S.Ct. 1732]. In my view, for the reasons stated in *Custis*, any such procedure constitutes an unwarranted refusal to accord such final judgments their normal force and effect upon defendant's sentence for later crimes. Hence, I cannot join in the majority's effort.[3]

The majority may feel that we are entitled to take such action in this appeal, as the highest court of California reviewing a California death judgment. But the majority overlook the implications of their ruling for future capital cases in this state. Hereafter, whenever a motion to strike filed in a California capital trial meets the majority's criteria for reconsideration of a prior appellate determination, the trial court will face the awkward and unseemly task of passing judgment on the reasoning and result of an appellate court.

Because both California and foreign appeals will presumably be subject to review under the majority's rule, a future California trial court may actually be obliged to decide, on the basis of the same record we previously considered, whether *this court* committed a "fundamental" constitutional error in a prior case. I do not envy any trial court put in such a position.

Finally, the majority suggest that allowing motions to strike in these limited circumstances will conserve judicial resources by eliminating the need for post-trial habeas corpus petitions which would ultimately prevail in either state or federal court. The majority miss the point. If a prior conviction cannot be attacked during the trial and appeal by means of a motion to strike,

---

[3]The majority suggest that issues raised and rejected in a prior appeal are nonetheless reviewable on a subsequent motion to strike in a capital case where an error, affecting "fundamental" constitutional rights, is "apparent from the [prior] appellate opinion itself" (maj. opn., *ante,* p. 1138) or "on the face of the [prior] judgment itself" (*ibid.*). In reality, however, the majority's test carries them well beyond the face of the prior opinion and judgment. Indeed, as they concede, they must review the transcripts of the 1971 proceeding to discover the relevant trial facts and to reach their conclusion that those facts were stated and applied incorrectly by the Illinois appellate court.

such an attack should be no more cognizable by means of a later habeas corpus petition. The overarching principle, which I believe both state and federal courts must apply after *Custis*, is that the Constitution contemplates *no* basis for a sentencing attack on a prior conviction, except where the defendant asserts a *Gideon*-style claim that counsel was completely withheld in the prior case.

I would therefore affirm the judgment in its entirety.

Lucas, C. J., concurred.

**MOSK, J.**—I dissent.

I would dismiss the appeal as moot. That is because I would have vacated the underlying judgment on habeas corpus. (See *In re Horton* (1991) 54 Cal.3d 82, 101-104 [284 Cal.Rptr. 305, 813 P.2d 1335] (dis. opn. of Mosk, J.).) It was not a superior court judge who presided over the trial of this cause and sentenced defendant to death. It was merely a commissioner, who was without authority to do so. I still "find it shocking that one who is not a judge chosen by and responsible to society can merely by inference and implication be given the awesome power of determining life or death for a human being." (*In re Horton, supra*, 54 Cal.3d at p. 101 (dis. opn. of Mosk, J.).)

Appellant's petition for a rehearing was denied January 24, 1996, and the opinion was modified to read as printed above.